**CARON FOUNDATION OF FLORIDA, INC., a Pennsylvania Corporation doing business as Caron Renaissance, Plaintiff,**

v.

**CITY OF DELRAY BEACH, a Florida municipal corporation, Defendant.**

Case No. 12–80215–CIV.

United States District Court, S.D. Florida.

May 4, 2012.

James Kellogg Green, James K. Green, P.A., West Palm Beach,. FL, for Plaintiff.

Jamie Alan Cole, Matthew Harris Mandel, Weiss Serota Helfman Pastoriza et al., Fort Lauderdale, FL, Robert H. De Flesco, III, Weiss Serota Helfman, Coral Gables, FL, for Defendant.

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WILLIAM P. DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon Plaintiff's Motion for Preliminary Injunction [DE 11], filed March 27, 2012. The Court has carefully considered the motion,

Defendant's Response in Opposition [DE 17], and Plaintiffs' Reply [DE 23], and is otherwise fully advised in the premises.

## STANDARD OF REVIEW

 To obtain a preliminary injunction, a plaintiff must prove (1) a substantial likelihood of success on the merits, (2) irreparable injury absent an injunction, (3) that the irreparable injury outweighs whatever damage the injunction may cause the opposing party, and (4) that an injunction is not adverse to the public interest. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir.1994). Because a "preliminary injunction is an extraordinary and drastic remedy, it is not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Id.* (quotation omitted). Moreover, when the moving party is seeking to have the opposing party perform an affirmative act, the burden is even higher: "A mandatory injunction . . . especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir.1958).[1]

 In ruling on a preliminary injunction, the Court makes preliminary findings of fact. At this stage, the evidentiary rules are relaxed. *See Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir.1995). A court may rely on affidavits and hearsay materials that would not admissible evidence for a permanent injunction, so long as the evidence is appropriate given the character and purpose of the injunction proceedings. *See id.* It may utilize written materials that are in the record. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310–13 (11th Cir.1998). The findings of fact and conclusions of law made when resolving a preliminary injunction are not binding at the trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

## BACKGROUND

Plaintiff ("Caron") sued Defendant (the "City") for violating the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Caron claims that the City has interfered with Caron's rehabilitation center for individuals recovering from alcoholism and substance abuse. Caron argues that the City denied Caron a reasonable accommodation for a home it purchased in a single-family neighborhood. It also claims that the City is discriminating against Caron through its zoning ordinances. Caron seeks declaratory and injunctive relief as well as monetary damages, costs, and reasonable attorneys' fees. This Court has jurisdiction of these claims under several statutes, including 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

Caron has had alcohol and substance abuse rehabilitation facilities in Palm Beach County for more than 20 years. It previously operated housing in the City at an apartment complex. More recently, it acquired two large homes in single-family neighborhoods near the ocean on Ocean Drive, an affluent area. Caron has developed the two Ocean Drive houses to cater to professionals or others with highly suc-

---

1. The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *Bon-* *ner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

cessful careers. These two homes would only be used to provide room and board for recovering addicts; clinical therapy would occur offsite at separate facilities. Nevertheless, Caron claims that a single-family setting provides important therapeutic benefits. The residents will function as a family household and provide mutual support. Caron has said four or five residents per house is the clinically required minimum to stave off isolation. [DE 10–5 at 5; DE 11 at 2].

In early 2011, Caron purchased its first Ocean Drive residence (the "First Ocean Drive House"). The home was a five bedroom, 6,120 square foot house. Caron wanted seven patients to stay at that location. The City had an ordinance limiting the number of unrelated individuals who could live together. On January 14, 2011, Caron applied for a reasonable accommodation to allow seven (7) unrelated individuals to reside together. The City requested more information on February 3, 2011, which Caron provided. The City granted the accommodation on February 14, 2011.

In January 2012, Caron purchased another home on Ocean Drive (the "Second Ocean Drive House"). This home was larger than the first, with 7,481 square feet. The previous month, Caron had applied for a reasonable accommodation so that the Second Ocean Drive House could also accommodate seven unrelated individuals. The application was essentially identical to the application submitted with the first request.

This time, substantial community opposition developed. For example, a community website opposing Caron's plan stated,

Drug, Alcohol and Sex Addict Rehab Should not be a Vacation!

Just say NO to Transient Housing. These Sober Houses should not be in Residential neighborhoods!

The large Caron Corporation is trying to Bully the City of Delray Beach into providing high class rehabilitation centers for dangerous transient Drug, Alcohol and Sex Addicts in the Beach area.... We urge all Delray Beach residents to be aware of the security risks and take action to stop this large corporate intrusion that threatens our safety, well-being and neighborhood character.

[DE 10–17]. Citizens made many other similar comments. [DE 10–15, 10–18].

Members of the zoning board and the Mayor also commented negatively about sober living facilities. One planning and zoning board member said that Caron's plans threatened the survival of the City. He indicated that Caron posed a risk to the most affluent areas of the city and that such a risk was unacceptable. [DE 10–20 at 7–8].[2] The chairman of the planning commission called the sober home movement

a cancer in this town and it is metastasizing quicker in ways that not all of us can get our arms around, but we are clearly being taken advantage of.... If it quacks like a duck it is a duck.... It plain stinks, we are being taken advantage of ... There has to be a way ... I don't care if the lawyer has to come from Olympus, there is somebody out there that is smarter than this scourge that is metastasizing in this town. It's not just destabilizing, it denigrates the neighborhood.... In the meantime, we keep them out and maybe they go plague some other place.

[DE 10–20 at 10–16]. The audience applauded after this comment. On a sepa-

2. All page numbers refer to the page number on the CM/ECF system.

rate occasion, the mayor said, "We have crafted three ordinances to restrict these operations in our community.... If you have any connections or ideas, we are willing to work with you in curtailing the conversion of single family homes into rehab centers.... We will revisit our three ordinances to see if we can put some more teeth in them, but keep in mind, Boca [Raton] tried, was sued and lost." [DE 10–21].

The City had been considering what to do with sober living facilities for some time. In August 2002, it attempted to pass an ordinance restricting "substance abuse treatment centers" from locating in residential neighborhoods. Such centers were defined broadly. They included locations only used for room and board even if treatment occurred at another location. On August 16, 2002, the U.S. Department of Justice warned the City that its ordinance would likely violate the FHA. [DE 10–1]. A neighboring city, Boca Raton, had a similar ordinance, which a federal district court judge held violated the FHA. *See Jeffrey O. v. City of Boca Raton*, 511 F.Supp.2d 1339, 1346–47 (S.D.Fla.2007).

Simultaneously with the surge in community opposition in 2012, the City reviewed its zoning ordinances. One ordinance brought into review was the "transient use" ordinance, which restricted the number of times a home could be leased during the year. The initial version of the ordinance was enacted in 2009. This version allowed dwelling units or tenant slots to be leased six times a year. For example, a five bedroom house could be leased at least 30 times in a year if each bedroom was a tenant slot. During oral argument on the underlying motion, counsel for the City acknowledged that the original transient use statute was passed in response to an Eleventh Circuit opinion that held that a facially neutral transient use statute would not violate the FHA or the ADA, even if it hampered sober living facilities. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1213–16 (11th Cir.2008).

On February 21, 2012, after public hearings in which citizens expressed outrage over Caron's plans, the City toughened its transient use ordinance, decreasing the number of times an owner could rent a dwelling during a year. The revised ordinance limited turnover to three times a year in single-family zoning districts and clarified that the turnover rate applied to the entire dwelling or any part thereof. This change is significant. Taking the example of a five bedroom house, under the new ordinance it could only be rented 3 times a year, down from 30 times under the old ordinance. That same day, the City also changed its reasonable accommodation ordinance, deleting the reference to 42 U.S.C. § 290dd that would allow applicants to omit the address of the proposed location if disclosure would endanger patient confidentiality. [DE 10–14]. The third relevant zoning ordinance limited the number of unrelated people who could live together. It limits a household to those individuals related either by blood, marriage, or adoption, or a "group of persons not more than three (3) in number of unrelated individuals." This ordinance was unchanged.

During this period of community opposition and ordinance review, the City processed Caron's reasonable accommodation request for the Second Ocean Drive House. The process was different than the first application. On both occasions, the City sent a letter requesting additional

information. For the Second Ocean Drive House, however, the City asked Caron for much more information than it had required on the first application. The City required Caron to provide the address of the property, zoning designation of the property, lot size of the property, a description of the location of the property in relation to surrounding properties, the floor plan of the property, a description of the parking, whether all residents would be disabled, whether any residents would be sexual offenders, a copy of Caron's rehabilitation license, all reports of medical professionals stating that seven (7) residents were therapeutically necessary to ameliorate the effects of the disability, all reports stating that seven (7) people were necessary for the property's financial viability, and how long each resident would reside in the property. [DE 10–11]. The City requested none of this information when Caron applied for the accommodation at the First Ocean Drive House.

On February 2, 2012, Caron answered many of the City's requests, but objected to others. [DE 10–12]. For example, Caron refused to provide the address for the Second Ocean Drive House, citing 42 U.S.C. § 290dd, which prohibits disclosure of confidential patient information if it is likely, directly or indirectly, to identify a patient. As noted previously, the City had an exemption for applicants if providing the address would disclose patient-identifying information. See [DE 10–4]. Regarding medical necessity, Caron attached the medical report of Sid Goodman. Mr. Goodman, Caron's executive director and a licensed mental health counselor, opined that the requested accommodation was proper: "Without such an accommodation, our clients' continued progress in recovery will be jeopardized." [DE 10–12 at 10]. He did not say that it was therapeutically necessary to house seven individuals in the same building, nor did he provide any medical research in support of his assertions. As for financial conditions, Caron did not attach information regarding financial necessity. With the remaining questions, Caron answered, but under an objection that the information was not required under the reasonable accommodation ordinance and had not historically been required.

The City's letter in response stated, "Based on the information you provided, it is still unclear as to whether or not seven (7) residents are necessary in order to make the subject property therapeutically successful with regard to ameliorating the effects of the specific disability being claimed on behalf of the intended residents." [DE 10–16]. It added that there was no information to show that housing seven individuals was financially necessary. The letter concluded, "Based on the lack of information provided to date, we are unable to approve this Reasonable Accommodation Request at this time to allow an additional four (4) unrelated persons to occupy the property; however, if you can provide additional information, then we will reconsider your request." Id.

## MOTION FOR PRELIMINARY INJUNCTION

■ Before considering the merits of the motion for a preliminary injunction, the Court will address Caron's standing. First, Caron argues that its clients are covered by the FHA and ADA. Individuals recovering from alcohol or other substance abuse can be considered disabled under the ADA and FHA. See 42 U.S.C. § 12210(b); 28 C.F.R. § 35.104(1)(ii) (listing "drug addiction" and "alcoholism" as physiological impairments); Jeffrey O., 511

F.Supp.2d at 1346–47; *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 336–40 (6th Cir.2002). Second, Caron asserts that because it serves qualified individuals with disabilities and Caron is challenging discriminatory zoning ordinances, it has standing. *See, e.g. A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 364 (4th Cir.2008) (finding standing for a care facility under the ADA); *Horizon House Dev. Servs., Inc. v. Twp. of Upper Southampton*, 804 F.Supp. 683, 692 (E.D.Pa. 1992) (holding that providers have standing under the FHA), *aff'd*, 995 F.2d 217 (3d Cir.1993). Based on the facts in this case, the Court finds that the individuals Caron seeks to serve qualify as protected individuals with disabilities. As a provider of services for these individuals, Caron has standing. The Court shall now address the merits of Caron's motion for a preliminary injunction.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

■ Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n. 4 (2d Cir.2003); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782–83 (7th Cir.2002). Both the ADA and FHA apply to municipal zoning decisions. *See Oconomowoc*, 300 F.3d at 781; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir.2002). One difference between the FHA and the ADA is that the FHA only applies to a "dwelling." *See Schwarz*, 544 F.3d at 1213–14. Sober living homes can constitute a dwelling. *See id.* at 1213–16. Based on the considerations provided in *Schwarz*, this Court finds that the Second

Ocean Drive House is a dwelling. Therefore, the Court will not differentiate its analysis between the FHA and ADA in this Order or in the cases cited, unless that distinction is relevant.

The ADA and FHA protect an individual with disabilities in two ways. First, they require entities to make reasonable accommodations for the sake of those with disabilities. 42 U.S.C. §§ 3604(f)(3)(B), 12131(2). Second, they make it unlawful for an entity to discriminate against individuals with a protected disability. 42 U.S.C. §§ 3604(f)(3)(B), 12132.

### 1. REASONABLE ACCOMMODATIONS

■ It is unlawful to refuse to make reasonable accommodations "in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHA does not provide, however, a "blanket waiver of all facially neutral zoning policies and rules, regardless of the facts ... which would give the disabled carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary." *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 603 (4th Cir.1997) (quotations omitted). The City is only required to make accommodations that are reasonable and necessary to afford individuals with disabilities equal opportunity to use and enjoy housing. *See id.*

■ The first step a plaintiff must take to succeed on a reasonable accommodation claim is to show that its claim is ripe. To show ripeness, a plaintiff must show that under the circumstances it has

afforded the appropriate local authority a reasonable opportunity to consider the proposed accommodation. *Schwarz*, 544 F.3d at 1219; *Marriott Senior Living Svcs., Inc. v. Springfield Twp.*, 78 F.Supp.2d 376, 385–86 (E.D.Pa.1999). The authority has the right to ask reasonable questions regarding the application. *See Oxford House, Inc. v. City of Va. Beach*, 825 F.Supp. 1251, 1262 (E.D.Va.1993) (stating that the FHA does not "insulate [the plaintiff] from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues").

In this case, the City argues that Caron failed to submit all required documents, so it has not yet obtained a final decision on its application. The City informed Caron that "it is still unclear as to whether or not seven (7) residents are necessary in order to make the subject property therapeutically successful with regard to ameliorating the effects of the specific disability being claimed on behalf of the intended residents" and that the City was "unable to approve this Reasonable Accommodation Request *at this time* ... however, if [Caron] can provide additional information, then [the City] will reconsider [Caron's] request." [DE 10–16] (emphasis added). The City claims that this letter was not a denial, and thus Plaintiff's complaint is unripe.

Caron responds that the letter was a denial. Caron juxtaposes the words "unable to approve" and "reconsider" in the City's letter to emphasize that the City conclusively made a determination. Because Caron believes that there was a denial, it asserts that its claim is ripe.

▆ The Court finds that Caron's reasonable accommodation claim is not yet ripe. The City specifically asked for evidence that housing seven unrelated individuals was necessary to achieve therapeutic purposes. This query was especially relevant given Caron's prior statements that only four or five residents were therapeutically necessary. [DE 10–5 at 5; DE 11 at 2]. Though Caron did provide the affidavit of its executive director, the City was could properly discount its import. This affidavit did not respond to the City's query asking for all medical evidence showing that housing seven individuals was necessary. The director essentially restated Caron's position that it would be good if seven people lived together, but did not provide any evidence that seven was the magic number.

Caron's counterargument is that it was legally excused from providing the additional information the City requested. For example, it claims that 42 U.S.C. § 290dd prohibited Caron from disclosing the address of the Second Ocean Drive House because the address could eventually lead to information identifying future patients. Caron further argues that the City's insistence on the address information, even though it violated the City's own ordinance, is evidence of bad faith and discriminatory intent. That may be true; however, it does not excuse Caron from complying with other reasonable requests for information, such as evidence of medical necessity. As the City put it, though the City may have erred in granting the accommodation request for the First Ocean Drive House, it need not compound that error by granting another unsupported accommodation. The Court is not persuaded that the request for additional information proved that providing information would be futile simply because the City asked for certain information that

was possibly out-of-bounds.[3] The City's letter specifically stated that the application would be reconsidered if evidence of medical or financial necessity was provided.[4] The letter did not request information that Caron claimed was confidential. Because Caron could have provided the information the City requested, and at least some of that information was relevant to reasonable necessity, Caron's reasonable accommodation claim is unripe at this time.

 Even supposing that ripeness were not a bar, because Caron did not submit many requested documents, it also has not shown that its requested accommodation was "necessary." Caron argues that a plaintiff can demonstrate necessity if it can show that living in the desired dwelling serves the therapeutic purpose of a substance abuse program. Living in a group setting may be necessary for therapy. *E.g. Schwarz*, 544 F.3d at 1227–28. Though this may be true in certain circumstances, it is insufficient to prove that Caron's requested accommodation was necessary in this case.

 To be "necessary," there must be a direct linkage between the proposed accommodation and the equal opportunity to be provided. *Bryant Woods*, 124 F.3d at 604. This relationship is akin to causation. *Id.* Caron must show that the accommodation "actually alleviates the effects of a handicap." *Schwarz*, 544 F.3d at

1226. If the requested accommodation exceeds the need, then the individual with a disability would receive a "better" opportunity to use a dwelling, which the FHA does not contemplate. *Id.* Such an accommodation would be "unnecessary."

Caron has not demonstrated a substantial likelihood of success on the merits of its reasonable accommodation claim. Caron chose not to provide the information needed to support the number of clients it claimed it needed in the facility. Thus, even if the claim were ripe, Caron would not be entitled to a preliminary injunction.

## 2. DISPARATE TREATMENT

 Caron argues that its disparate treatment is not subject to the same sort of ripeness challenge. Disparate treatment claims do not require the same municipal application process. Therefore, though Caron's reasonable accommodation claim is unripe, the disparate treatment claim can still proceed. *See United States v. Vill. of Palatine*, 37 F.3d 1230, 1233 n. 3 (7th Cir.1994) (noting that a disparate treatment claim could be ripe even if the reasonable accommodation claim was not); *Lapid Ventures, LLC v. Twp. of Piscataway*, No. 10–6219, 2011 WL 2429314, at *6 (D.N.J. June 13, 2011) (same). The Court finds that Caron's disparate treatment claim is not barred for being unripe and therefore will proceed to analyze it.[5]

 The FHA and ADA prohibit disparate treatment of those with disabili-

---

3. The Court takes no position on the applicability of 42 U.S.C. § 290dd and whether it would indeed foreclose Caron from providing the address of its rehabilitation house.

4. In fact, the City has argued that because the City has granted many rehabilitation accommodations both before and after Caron made its current request, [DE 17–4 ¶¶ 6–8, 15], Caron could not make a showing of futility if it tried.

5. Caron also briefly asserts a disparate impact claim, but offers no statistical evidence or any real argument in support of how disparate impact was shown. Caron has not shown a substantial likelihood of success on a disparate impact claim. *See Schwarz*, 544 F.3d at 1201 (citing *Tsombanidis*, 352 F.3d at 577) (describing the requisite statistical showing for a disparate impact claim).

ties. 42 U.S.C. §§ 3604(f)(3)(B), 12132. To prove disparate treatment, the plaintiff must show the defendant in fact intended to discriminate or was improperly motivated in making the discriminating decision. *Bonasera v. City of Norcross,* 342 Fed. Appx. 581, 584 (11th Cir.2009). However, the desire to discriminate need not be the sole motivating factor. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* As a result, it is sufficient that the discriminatory reason is a motivating factor behind a legislature or administrative body's decision. *Id.* at 265–66, 97 S.Ct. 555.

Caron asserts that the City's transient ordinance is facially discriminatory because "transient" is merely a proxy word for "disabled." Neutral proxy terms can be facially discriminatory. *See McWright v. Alexander,* 982 F.2d 222, 228 (7th Cir. 1992) (providing examples). For example, one court found "community based residential facility" to be a proxy for "disability." *Cmty. Hous. Trust v. Dep't of Consumer & Reg. Affairs,* 257 F.Supp.2d 208, 225 (D.D.C.2003). In this case, the City's advisory board and mayor acknowledged that the "transient" ordinance was given teeth to forestall the expansion of rehabilitation programs. Caron claims that this evidence shows that "transient" is a code word for "disability" and that it has shown that the transient use policy is facially discriminatory.

▮ The Court disagrees. When considering a facial challenge, intent is irrelevant, as both Caron and the City ac-

knowledge. *See Int'l Union v. Johnson Controls, Inc.,* 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991); *Jeffrey O.,* 511 F.Supp.2d at 1349. Setting aside the issue of intent and solely looking at the language of the transient use ordinance, the Court does not find that it facially discriminates. It is unlike the policies described in *McWright,* in which an employer might have a "no grey hair" rule. *See McWright,* 982 F.2d at 228. Facially, it might appear that such a grey hair rule would apply to all, but the fit between older workers and grey hair is so much stronger than the fit between young workers and gray hair, so the policy in fact is discriminatory. *Id.* In the present case, the City is a popular tourist area near the beach, so it has many "transient" vacationers or snowbirds that the transient use ordinance would reach. The fit between these kinds of transients versus rehabilitative transients is not so skewed as to indicate facial discrimination.

The City's transient ordinance is also unlike the "community based residential facility" ordinance in *Community Housing Trust.* In that case, the District of Columbia required community based residential facilities to obtain a certificate of occupancy. *Cmty. Hous. Trust,* 257 F.Supp.2d at 222. These facilities by definition housed residents who needed treatment, rehabilitation, assistance, or supervision. *Id.* Individuals who did not require treatment did not have to obtain a certificate of occupancy. *Id.* The court ruled that the ordinance facially discriminated against individuals with disabilities. *Id.* at 224–25. The terms of the ordinance expressly targeted individuals with disabilities, even if it did not specifically use the word "disability." In contrast, in this case, the transient use ordinance is not defined to specifically target the disabled. Facially, it applies just

as well to vacationers or snowbirds. The Court finds that the transient use ordinance is not facially discriminatory, so Caron has not shown a substantial likelihood of success for facial discrimination.

■ Discriminatory intent can also be shown circumstantially. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court considered whether a municipality had discriminated in violation of the Equal Protections Clause and the Fair Housing Act. A developer desired to build low- and moderate-income housing that would have attracted racial minorities. *Id.* at 255–58, 97 S.Ct. 555. The municipality ultimately denied the application to rezone the property after public hearings in which both discriminatory and nondiscriminatory public opinions were voiced. *Id.* at 258, 97 S.Ct. 555. In evaluating the municipality's actions, the Supreme Court provided a list of factors that other courts could consider in order to determine whether a municipality had acted with unlawful discriminatory intent. This Court will take those factors and apply them to the facts of this case.

■ The first inquiry is whether the historical background of the decision reveals a series of official actions taken for invidious purposes. *Id.* at 267, 97 S.Ct. 555. In this case, the City has a history of trying to restrict the ability of individuals with disabilities from residing in single family areas at rehabilitation facilities. In 2002, it aborted an attempt to clamp down on such facilities after the Department of Justice warned the City that the proposed ordinance would violate the law. Though this occurred ten years ago, the Eleventh Circuit has found error for excluding evidence of past discrimination that occurred

ten years ago. *See Jean v. Nelson*, 711 F.2d 1455, 1492 n. 37 (11th Cir.1983) ("This string of ten years during which Mr. Gollobin could testify to persistent mistreatment was obviously relevant under the historical background factor of *Arlington Heights*. Nevertheless, the district judge cut short the testimony .... yet the citation of authority by the Supreme Court in *Arlington Heights* indicates a ten-year period may well be relevant."); *see also Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 210, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) ("We reject any suggestion that remoteness in time has any relevance to the issue of intent. If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less 'intentional.' ").

In addition, the City's original transient use statute was admittedly passed after the Eleventh Circuit upheld such an ordinance as nondiscriminatory. In *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir.2008), the City applied an old transient use ordinance predating the plaintiff's establishment in order to prevent continued use of a house as a group home. The Eleventh Circuit, however, was careful to note that the adoption of such an ordinance might be unlawful if done with the intent to discriminate against group homes. *See id.* at 1217 (noting that even if the plaintiff showed that citizens and city officials were biased against recovering addicts, such evidence was irrelevant because the challenged ordinance applied the same to all; however, "[t]he analysis might have been different if [the plaintiff] claimed that the City enacted the occupancy-turnover rule in order to discriminate against people with disabilities.").

To say that the City adopted a transient use ordinance after the Eleventh Circuit upheld such an ordinance is not to say that the City necessarily enacted the ordinance in order to discriminate. The City may have been wanting to enact such an ordinance for legitimate reasons, but feared to do so because it thought it would be viewed as evidence of discrimination. This argument is available to the City in this litigation. At this point, however, connected with the prior attempt to restrict sober living facilities and the specific sequence of events yielding the modification of the ordinance, discussed next, the Court finds that the adoption of the transient use ordinance in the wake of the *Schwarz* case also suggests a history of discrimination. The Court finds that the first factor tips in favor of a finding of discriminatory intent.

■■■■ The next *Arlington Heights* factor is the "specific sequence of events leading up to the challenged decision."

429 U.S. at 267, 97 S.Ct. 555. Here, Caron applied for a reasonable accommodation in December 2011. Community outrage erupted. The City retained counsel to reexamine its ordinances directly as a result of Caron's application and the public outcry: in January 2012, counsel for the City placed on its website a page stating, "The Delray Beach City Commission voted to retain WSH to help the City redraft several City ordinances that regulate transient and sober housing in residential neighborhoods and potential litigation.... Residents urged City Hall to ask for tighter rules after news broke that Caron Foundation, an addiction-rehabilitation center, planned to open a facility near the City's beach." [DE 10–10].[6] While amendments were being considered, there was vocal community and planning board opposition to rehabilitation facilities in single family areas. The City modified its transient use ordinance. The City denied Caron's reasonable accommodation request the next

6. The Court finds that it cannot deem the City's attorneys' webpage as the City's own words by way of agency. "An attorney, as any other agent, may make statements which the law attributes to the principal. Lawyers can and frequently do make statements which, had the client made them, would be admissible as admissions. Whether they are admissible against the principal depends, as with any other agency, on the scope of the agent's (attorney's) authority." *Laird v. Air Carrier Engine Serv., Inc.*, 263 F.2d 948, 953 (5th Cir.1959). The firm's comments on its website were a means of self-promotion, not a comment made on behalf of the City. Therefore, the Court finds that it was not within the scope of the attorneys' authority.

However, the comment can still be relevant. *See* Fed.R.Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Ordinarily, what the City told its attorneys regarding the scope and purpose of representation would be protected by the attorney-client privilege. *See*

*United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir.1990) (noting that communications for the purpose of securing legal services can qualify for the privilege). The client holds the attorney-client privilege. *See, e.g., Smith v. Armour Pharm. Co.*, 838 F.Supp. 1573, 1576 (S.D.Fla.1993). Thus, the firms' public announcement of the conversation would not necessarily waive the privilege. *See id.* ("Recognizing that, in practical terms, the contents of the document are no longer confidential is different from ruling that, in legal terms, the client holding the privilege has lost the privilege because someone else disclosed the document to the public.... The fact that the contents of the document have become widely known is not dispositive of the legal privilege attaching to the document."). However, at no point in this litigation has the City objected to the firm's very public disclosure or its inclusion in the record. This could be construed as the City acquiescing to the disclosure, causing a waiver. *See McCormick on Evidence* § 93 (6th ed. 2009) (discussing failure to object). The Court will therefore consider the firm's statement.

day. This sequence is highly suspect and strongly suggests that the City acted with an improper discriminatory motive.

 The third *Arlington Heights* consideration is whether the municipality departed from its ordinary procedural sequence in reaching its decision. 429 U.S. at 267, 97 S.Ct. 555. There is no evidence that the City's procedure in adopting the transient use ordinance was unconventional. There is evidence, however, that the City's procedure varied in processing Caron's second reasonable accommodation request. Compared to the first application, much more information was required. Because the Court is attempting to determine whether there is an inference of intentional discrimination against Caron and rehabilitation facilities, the Court finds this evidence is relevant for determining the City's general discriminatory intent, even if the procedural variation was not strictly related to challenged transient use ordinance. Because the additional information requested generally appears reasonable, and the City did not press its demand for possibly confidential address information, the Court finds that this change of procedure only marginally suggests discrimination.

 Another consideration is whether the City departed from its substantive approach. *Id.* For example, "if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," then this can lead to an inference of discrimination. *Id.* Caron has not provided the Court with sufficient information on this matter, so Caron has failed to show that this factor suggests discrimination.

 The final *Arlington Heights* factor concerns legislative or administrative his-

tory: "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. 555. Members of the City's planning board made blatantly discriminatory statements, even calling rehabilitation facilities a "cancer." This board was the body that prepared the amendments that the City ultimately adopted. *See* [DE 17–6 at 3]. The planning board voted unanimously in favor of the amendments. *Id.*

The City points out that the planning board was merely advisory and lacked decisionmaking power to change the ordinances. It cites *Hallmark Developers, Inc. v. Fulton County,* 466 F.3d 1276, 1285 (11th Cir.2006), for the proposition that a city employee's racist comment does not establish that a board member in the decisionmaking body acted with discriminatory intent. *Hallmark* is distinguishable. *Hallmark* dealt with discrimination in denying a reasonable accommodation, whereas at this stage in the litigation, the Court is solely concerned with discrimination in modifying the transient use ordinance. The employee in *Hallmark* took no part in the decisionmaking process on the reasonable accommodation application. *Id.* Here, however, the planning board formulated the modified ordinances and presented them for approval. Though not the final-level decisionmakers, they were decisionmakers to some extent. The Court finds the evidence of the planning board's statements relevant and suggestive of discrimination, though not the smoking gun it would have been had the final decisionmakers made the comments.

That is not to say that the record lacks evidence that the final decisionmakers also

shared in the discriminatory animus. At least one of the city commissioners approved of stereotypical and discriminatory statements the public made. After a public hearing, the transcript reflects that Commissioner Alperin declared, "I think the public stated my views succinctly." *See* [DE 10–15 at 18]. Though some comments were neutral and legitimate, such as discussing the wholesome values of single-family neighborhoods and the benefits of vested interests that accrue due to lower turnover, many were starkly discriminatory. One man equated individuals undergoing drug treatment with psychotic individuals who must be confined at all times or they will endanger the community. [DE 17–6 at 4]. A woman said she was "tired of bumping into every addict everywhere she goes," then equated addicts to panhandlers, and finally said that she was ashamed she had told her friends to invest in property in the City. *Id.* at 7. Another person accused the City of being "asleep" and allowing what was a "village-by-the-sea" to become the drug rehabilitation capital of the southeast. *Id.* at 4. Others spoke of fear of transient housing.

Dr. Alperin could not have missed these discriminatory comments before adopting all comments wholesale. His adoption is even more striking, because the commissioner who spoke immediately before him said, "I think Commissioner Frankel stated my views succinctly." [DE 10–15 at 18]. Frankel's views were much more neutral in tone and discussed a desire to comply with the FHA and ADA. *See* [DE 17–6 at 9]. By choosing to adopt the public's statements rather than Frankel's, the inference is that he was more closely aligned with the public than with Frankel. As a result, the evidence suggests that he

shared in the discriminatory motive. Based on evidence that the planning board, who initially prepared the ordinances, and at least one member of the decisionmaking body had discriminatory motivation, the Court finds that transient use ordinance's administrative history weighs in favor of finding discriminatory intent.

In reaching this conclusion, the Court does not believe that the mayor's comments contribute to the inference of discrimination. The mayor's statements expressed a desire to limit the expansion of rehabilitation facilities. The City points out that it is not unlawful to express frustration with proposed plans. *See Schwarz v. City of Treasure Island,* 521 F.Supp.2d 1307, 1319–20 (M.D.Fla.2007) (holding that commissioner's comments expressing frustration with rehabilitation centers did not demonstrate discriminatory intent), *rev'd on other grounds,* 544 F.3d 1201 (11th Cir.2008). The mayor's comments actually reflected a desire to regulate rehabilitation facilities in a law-abiding way. He expressed a desire to not violate the law as Boca Raton had, though he stated that he would like to "curtail" conversion of single-family homes to rehabilitation facilities. [DE 10–21]. These comments at best are mildly indicative of discrimination and do not meaningfully contribute to a finding of discrimination.

Evaluating these *Arlington Heights* factors, the Court finds that Caron has shown a substantial likelihood of success that the City was motivated by a desire to discriminate against individuals and entities protected by the FHA and ADA when it modified the transient use ordinance on February 21, 2012.[7] Specifically, the Court finds that the sequence of events

---

7. The evidence that the City changed the

amount of information requested for the Sec-

and administrative history strongly suggest discriminatory intent, and the City's history with rehabilitative facilities, though much weaker and inconclusive on its own, also suggests discrimination.

Next, the burden shifts to the City to provide legitimate, nondiscriminatory reasons for the apparent discrimination. *See Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n. 6 (11th Cir.1993) (applying the burden shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in FHA cases lacking direct evidence of discrimination).[8] Paul Dorling, the City Planning and Zoning Director, provided the City Commission with a report that provides several legitimate reasons for enacting a transient use rule. [DE 17–8]. First, transients maximize occupancy, straining infrastructure. Second, rapid turnover is disruptive to family neighborhoods. Third, transient residences displace permanent residents, decreasing state revenue sharing funds and reducing social services for quality of life, commercial interests, and visitors. Fourth, the City has argued that tran-

sients will not have the same sense of stewardship for properties that owner-residents would have. The Supreme Court has recognized a legitimate interest in single-family zoning districts, *see Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), as has the Eleventh Circuit, *see Schwarz*, 544 F.3d at 1222. In light of this evidence, the Court finds that the City has satisfied its *McDonnell Douglas* burden.

The burden then reverts to Caron to show that these proffered reasons are pretextual. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. The Court finds that Caron has shown a substantial likelihood of success on its argument that the City's proffered reasons are pretextual. The highly suspicious timing of the change, coupled with discriminatory comments and a history of trying to legislatively exclude sober living facilities indicates that the City was indeed motivated at least in part by discriminatory reasons. Therefore, the Court concludes that Caron has shown a substantial likelihood of success on its disparate treatment claim based on the transient use amendment.[9]

ond Ocean Drive House's reasonable accommodation application may very well be helpful to Caron once it shows that its reasonable accommodation claim is ripe. At this point, however, since that claim is unripe, the Court cannot find disparate treatment due to the reasonable accommodation request. That evidence is merely more circumstantial evidence that the City was motivated by a desire to discriminate against Caron in altering its ordinances.

8. The Court notes that the Sixth Circuit has held that when *Arlington Heights* applies, there is no need to step through the burden-shifting framework of *McDonnell Douglas*, because *Arlington Heights* "can prove the ultimate question of discrimination *vel non.*" *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 70 F.3d 1272, at *5 (6th Cir.1995). This

approach seems less hazardous for a district court, because the Eleventh Circuit has stated that it can be error to apply the *McDonnell Douglas* test when direct evidence suggests discrimination, *Thompkins v. Morris Brown College*, 752 F.2d 558, 564 (11th Cir.1985), and the line between direct evidence and circumstantial evidence is not always crystal clear.

9. The City also argues that even if there is evidence that the City had discriminatory intent, Caron must show that it has "actually been treated differently than similarly situated nonhandicapped people." *Schwarz*, 544 F.3d at 1216. The City claims that Caron has not shown the ordinance was enforced differently against it than other individuals or entities. As a result, their disparate treatment claim must fail. *See id.* at 1217 (holding that evi-

## B. IRREPARABLE HARM

■ The parties' arguments on irreparable harm mainly focused on the impact of the ordinance governing the number of unrelated individuals who can reside together, making arguments about the relevance of excess capacity in current buildings. Because the challenged ordinance is the transient use ordinance, these arguments are beside the point. Caron's clients would stay on average 60 to 90 days at the Second Ocean Drive House. Even if Caron could house large numbers of unrelated individuals, the turnover rule of the transient use ordinance would prevent Caron from effectively running its program. A five bedroom house with five original tenants turning over in two months would leave the house empty after four months. The house would sit empty the majority of the year. The house would essentially be inoperable.

■ Frustration of a rehabilitation provider's mission can cause irreparable harm. *See Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n,* 790 F.Supp. 1197, 1208 (D.Conn.1992) (noting that there can be a presumption of irreparable harm, but finding under the facts actual irreparable harm because the plaintiff's goal to help HIV patients was thwarted and monetary damages could not compensate); *Easter Seal Soc. v. Twp. of N. Bergen,* 798 F.Supp. 228, 237 (D.N.J.1992)

("For each day this project is delayed, protected individuals are forced to move into other environments which endanger their recent recovery constituting threatened irreparable harm"). Because Caron's mission to assist recovering addicts is thwarted due to the Second Ocean Drive House being effectively rendered inoperable by the amended transient use ordinance, and because protected individuals are thereby forced to move elsewhere, the Court finds that without an injunction Caron suffers irreparable harm for which monetary damages cannot compensate.

## C. BALANCE OF THE HARMS

■ Caron claims that the City will not be harmed if it grants the accommodation. It does not believe that the rehabilitation site will change the single-family character of the neighborhood and that the clients it houses will have no greater impact on municipal services than any other large family. In addition, Caron argues that individuals with disabilities have a strong interest in living in the residence of their choice in the community, outweighing the inconvenience the City would face. Caron would suffer great harm if it were stymied in its mission to serve recovering addicts.

The City responds that the City indeed would be greatly harmed if Caron obtained its desired injunction. The City believes that it would be unable to enforce the

---

dence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the addicts were treated differently than non-addicts).

However, the Eleventh Circuit also noted, "The analysis might have been different if [the treatment provider] claimed that the City enacted the occupancy-turnover rule in order to discriminate against people with disabilities." *Id.* at 1217. Here, there is evidence of

intentional discrimination. The *McDonnell Douglas* framework is not a hard-and-fast framework; it can be modified as necessary. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1123 (11th Cir.1993). Its purpose is to provide a structured system of inferring discrimination. *See Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1326 (11th Cir.2011). In this case, in light of the other evidence of discrimination, the Court finds that the lack of a comparator is not fatal to Caron's case.

transient use ordinance, would have to grant the accommodation at the Second Ocean Drive House, and would have to process any further applications from Caron without further discriminatory action. The City believes the transient use ordinance is important to maintain the character of its residential areas.

The Court acknowledges the competing interests, but finds that Caron prevails on the balance of the harms. Although an injunction as broad as the City imagines could tip the balance in the City's favor, the Court's carefully tailored injunction does not. First, the City need not fear having to grant the reasonable accommodation request at this point. Because Caron has failed to demonstrate a substantial likelihood of success on its reasonable accommodation claim, the Court will not order the City to grant Caron an accommodation at this time.

As for an inability to enforce the transient use ordinance, the Court will only enjoin the City from enforcing the *amended* transient use ordinance against Caron. The only evidence Caron provided to show that the original transient use ordinance was passed with discriminatory motives was that the City adopted it in the wake of the *Schwarz* case and that the Department of Justice had cautioned the City against passing an ordinance that would have regulated sober living facilities. As noted earlier, that evidence is inconclusive standing by itself, because the City may have just been waiting for a "green light" for passing a nondiscriminatory, broadly applicable transient use ordinance. The Court does not find that Caron has shown a substantial likelihood of success on an argument that this original ordinance was passed for discriminatory reasons. As a result, though the City may not enforce the amended transient use ordinance against Caron, the City may still enforce its original transient use ordinance against Caron. At this point, the Court takes no position on the City's ability to enforce the amended transient use ordinance against parties other than Caron and thus will not enjoin its enforceability against other entities.

Finally, the Court sees no harm in requiring the City to process any of Caron's future applications without discrimination. With or without an injunction, the City is under an obligation to obey the law, and the injunction will add little to that duty.

### D. PUBLIC INTEREST

█ Finally, Caron must show that an injunction is not against the public interest. Through the FHA and ADA, Congress has declared that it is in the public interest to allow individuals with disabilities to live on an equal footing with the non-disabled. Therefore, it is not against the public interest to enjoin discrimination against individuals with disabilities or those who provide housing and treatment services on their behalf.

### CONCLUSION

Caron has not satisfied its burden of demonstrating that its reasonable accommodation claim is ripe or that it has a substantial likelihood of success on the merits of that claim. It has, however, shown a substantial likelihood of success in demonstrating that the City unlawfully discriminated when it passed an amended transient use ordinance. That amendment irreparably harms Caron. Though there are competing interests involved, the balance of the equities is in Caron's favor. Granting a preliminary injunction against

enforcing the amended transient use ordinance will not be contrary to public interest.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff Caron Foundation of Florida, Inc.'s Motion for Preliminary Injunction [DE 11] is **GRANTED IN PART;**

2. The Court preliminarily **ENJOINS** Defendant The City of Delray Beach from enforcing its amended transient use ordinance against Plaintiff Caron Foundation of Florida, Inc.;

3. The Court also preliminarily **ENJOINS** Defendant The City of Delray Beach from violating the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, or the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as it processes Caron's reasonable accommodation request, should Plaintiff choose to continue pursuing such an accommodation by providing additional information and/or reapplying, if necessary.

**DONE AND ORDERED.**