**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACIFIC SHORES PROPERTIES, LLC, a California limited liability company; ALICE CONNER; SEAN WISEMAN; TERRI BRIDGEMAN, *Plaintiffs-Appellants*, <br><br> ANDREW BLAIR, *Plaintiff*, <br><br> v. <br><br> CITY OF NEWPORT BEACH, a California municipal corporation, *Defendant-Appellee*. | No. 11-55460 <br><br> D.C. No. 8:08-cv-00457-JVS-RNB |

| | |
|---|---|
| NEWPORT COAST RECOVERY LLC, a California Limited Liability Company; YELLOWSTONE WOMEN'S FIRST STEP HOUSE, INC., *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF NEWPORT BEACH, a California municipal corporation, *Defendant-Appellee*. | No. 11-55461 <br><br> D.C. No. 8:09-cv-00701-JVS-RNB <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
November 6, 2012—Pasadena, California

Filed September 20, 2013

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
and Sidney R. Thomas, Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### Housing Discrimination

The panel reversed the district court's orders granting summary judgment in favor of the City of Newport on claims that a City ordinance violated the Fair Housing Act, the Americans with Disabilities Act, the California Fair Employment and Housing Act, and the Equal Protection Clause by having the practical effect of prohibiting new group homes for recovering alcoholics and drug users from opening in most residential zones.

The panel held that the district court erred in disregarding the evidence that the City's sole objective in enacting and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

enforcing its ordinance was to discriminate against persons deemed to be disabled under state and federal housing discrimination laws. The panel held that the plaintiffs were not required to identify similarly situated individuals who were treated better than themselves in order to survive summary judgment. It held that where there is direct or circumstantial evidence that the defendant has acted with a discriminatory purpose and has caused harm to members of a protected class, such evidence is sufficient to permit the protected individuals to proceed to trial under a disparate treatment theory.

The panel also held that the district court erred in concluding that the plaintiffs failed to create a triable issue of fact as to whether the losses that their businesses suffered were caused by the enactment and enforcement of the ordinance when the plaintiffs presented evidence that they experienced a significant decline in business after the ordinance's enactment, that the publicity surrounding the ordinance greatly reduced referrals, and that current and prospective residents expressed concern about whether the group-home plaintiffs would close. In addition, the panel held that the costs borne by the plaintiffs to present their permit applications and the costs spent assuring the public that they were still operating despite the City's efforts to close them were compensable. Finally, the panel held that the district court erred in dismissing one plaintiff's claim for emotional distress, but correctly dismissed another plaintiff's similar claim.

**COUNSEL**

Elizabeth Brancart (argued) and Christopher Brancart, Brancart & Brancart, Pescadero, California; and Steven G. Polin, Law Offices of Steven G. Polin, Washington, D.C.; for Plaintiffs-Appellants.

T. Peter Pierce (argued), Saskia T. Asamura, and Toussaint S. Bailey, Richards Watson & Gershon, P.C., Los Angeles, California; and Aaron Harp, City Attorney of Newport Beach, Newport Beach, California; for Defendant-Appellee.

Thomas E. Perez, Assistant Attorney General, Dennis J. Dimsey, Teresa Kwong (argued), United States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Amicus Curiae United States.

Chris M. Amantea and Alexandrea H. Young, Hunton & Williams LLP, Los Angeles, California; and Paula D. Pearlman, Shawna L. Parks, and Umbreen Bhatti, Disability Rights Legal Center, Los Angeles, California, for Amici Curiae Disability Rights Legal Center, Disability Rights California, Western Center on Law and Poverty, and Disability Rights Education & Defense Fund.

Kira L. Klatchko and Jeffrey V. Dunn, Best Best & Krieger LLP, Indian Wells, California, for Amicus Curiae League of California Cities.

## OPINION

REINHARDT, Circuit Judge:

Prior to 2008, "group homes"—i.e., homes in which recovering alcoholics and drug users live communally and mutually support each other's recovery—were generally permitted to locate in residential zones in the City of Newport Beach ("the City") and they did so freely.[1]  By 2008, a number of residents of the City launched a campaign to restrict or eliminate group homes in their neighborhoods. After enacting several moratoria, the City enacted an Ordinance ("the Ordinance") which had the practical effect of prohibiting new group homes from opening in most residential zones.  Even in the few areas where they were permitted to open, new group homes were required to submit to a permit process.  Existing group homes also had to undergo the same permit process in order to continue their operations.  Among the factors to be considered when granting or denying a permit to any group home was the number of other such facilities in the neighborhood.

On its face, the Ordinance did not single out group homes; persons recovering from addiction are protected from housing discrimination under state and federal anti-discrimination laws. Instead, the Ordinance facially imposed restrictions on some other types of group living arrangements as well.  At the same time, the City did not impose similar

---

[1] We follow the parties' convention in referring to addiction recovery facilities as "group homes."  The term "group homes" is not defined in the Ordinance or in any relevant statute, however.  As used by the parties and in this opinion, the term refers only to addiction recovery facilities and not to any other sort of communal living arrangement.

regulations on properties rented by homeowners to vacationing tourists, despite the fact that such rental properties may cause similar social problems as group homes. On advice of counsel, the City had initially planned to regulate such rental properties in order to avoid the appearance of discriminating against group homes, but it backed down from doing so in the face of opposition from a number of City residents.

Taken in the light most favorable to the non-moving party, Plaintiffs' evidence shows that the City's purpose in enacting the Ordinance was to exclude group homes from most residential districts and to bring about the closure of existing group homes in those areas. The evidence also shows that the Ordinance regulated other types of group residential arrangements primarily for the purpose of maintaining a veneer of neutrality. Several existing group homes, which, as a result of the Ordinance, were required to apply for a use permit in order to continue operating in residential areas, sued the City, alleging that the Ordinance discriminated against them as facilities that provide housing opportunities for disabled individuals recovering from addiction. The district court acknowledged the evidence that the City acted with a discriminatory motive but found that evidence "irrelevant" because, it stated, the City had not treated group homes any worse than certain other group living arrangements.

We reverse and hold that the district court erred in disregarding the evidence that the City's sole objective in enacting and enforcing its Ordinance was to discriminate against persons deemed to be disabled under state and federal housing discrimination laws. Although plaintiffs in an anti-discrimination lawsuit may survive summary judgment by

identifying similarly situated individuals who were treated better than themselves, this is not the only way to demonstrate that intentional discrimination has occurred. Where, as here, there is direct or circumstantial evidence that the defendant has acted with a discriminatory purpose and has caused harm to members of a protected class, such evidence is sufficient to permit the protected individuals to proceed to trial under a disparate treatment theory. This is no less true where, as here, the defendant is willing to harm certain similarly-situated individuals who are not members of the disfavored group in order to accomplish a discriminatory objective, while preserving the appearance of neutrality.

We also hold that the district court erred in concluding that the Plaintiffs failed to create a triable issue of fact as to whether the losses that their businesses suffered were caused by the enactment and enforcement of the Ordinance. The Plaintiffs presented evidence that they experienced a significant decline in business after the Ordinance's enactment, that the publicity surrounding the Ordinance greatly reduced referrals, and that current and prospective residents expressed concern about whether the group home Plaintiffs would close. By requiring the Plaintiffs to prove more, the district court failed to draw all reasonable inferences in their favor, as it was required to do at summary judgment. In addition, we hold that the costs borne by the Plaintiffs to present their permit applications and the costs spent assuring the public that they were still operating despite the City's efforts to close them are compensable. Finally, we hold that the district court erred in dismissing Plaintiff Wiseman's claim for emotional distress, but correctly dismissed Plaintiff Bridgeman's similar claim.

**FACTUAL BACKGROUND**

**I**

Newport Beach ("the City") is a Southern California beachfront community with about 80,000 residents and is one of the wealthiest cities in the United States.[2]  In the late 1990s "group homes" began opening in increasing numbers in the City, particularly in the beachfront neighborhoods of West Newport and Balboa Park.  Group homes are residential facilities in which individuals recovering from drug and alcohol addiction temporarily reside.  They provide a communal living environment in which residents help each other to recover from their addictions.  In order to preserve a substance-free environment, group homes limit occupancy to persons who are sober; a resident who uses drugs or alcohol is immediately evicted.  Because individuals recovering from addiction need to stay for varying lengths of time, they do not typically sign written leases.  Typically, group home operators meet with and screen potential residents in advance to ensure that they are serious about pursuing a sober lifestyle.

By April 2007, the City contained 73 group homes, 48 of which were licensed treatment facilities and 25 of which were unlicensed sober houses.[3]  At that time the City also had 801

---

[2] It is also the setting for the popular television show *The O.C.*, now playing on secondary runs.  Also currently showing on Netflix is *Arrested Development*.

[3] There are two types of group homes.  Unlicensed "sober houses," also known as "sober living homes," are group homes occupied by persons in recovery with no formal substance abuse treatment program.  Licensed

outstanding short-term lodging permits, which were issued to owners of properties that were regularly offered for rental for short periods of time. These homes are usually rented for profit for a period of 30 days or fewer to tourists who elect Newport Beach as a beach vacation destination. Like group homes, short-term lodgings cater to a revolving clientele that can cause strains on neighborhood resources. In Newport Beach, "short term lodgings" are generally referred to as "vacation homes," and we use the terms interchangeably.

The three group home Plaintiffs, Pacific Shores Properties LLC ("Pacific Shores"), Newport Coast Recovery LLC ("NCR"), and Yellowstone Women's First Step House, Inc. ("Yellowstone") (collectively, "the Group Homes") were part of the influx of group homes into Newport Beach during the mid-to-late 1990s and the early 2000s. The individual Plaintiffs are, respectively, one of the owners and two former residents of Pacific Shores. Pacific Shores and Yellowstone operate unlicensed sober houses, while NCR is a state-licensed facility. Each Group Home spent hundreds of thousands of dollars purchasing and renovating the homes it operates.

The increasing number of group homes in Newport Beach generated escalating hostility on the part of some City residents who, in a series of public meetings, repeatedly described the persons in recovery as "not true handicapped," "criminals," "gang members," and "druggies," among other

California Alcohol and Drug Program ("ADP") facilities, by contrast, provide substance abuse treatment on site.

derogatory terms.[4]  In response to these concerns, the City passed a series of moratoria in 2007—Ordinances 2007-8, 2007-10, and 2007-16 (collectively, the "Moratoria")—followed by a new permanent zoning Ordinance 2008-5 ("the Ordinance").  Because the City's intent in passing these measures is central to this appeal, we recount their history in detail.

## II

The City's attempts to formally address group homes began at a City Council meeting on January 23, 2007.  At that meeting, members of the public expressed their displeasure with group homes and submitted a petition signed by 88 residents asking the City Council to address the issue. Shortly before that meeting, in an email to a concerned citizen, then-Mayor Rosansky wrote, "I suspect that these [group home] facilities do nothing to really solve the problem but only serve as wherehouses [sic] for alcoholics and drug addicts until they really hit bottom."

The City Council decided to form an Intense Residential Occupancy Committee ("IROC") "to review and understand the state and federal laws and regulations that limit [the] City's ability to regulate" and "to research and identify solutions to the problems and make . . . recommendations to the [C]ity [C]ouncil for changes to regulations applicable to all residential uses in a manner that preserves the residential

---

[4] One City resident described the attitude in Newport Beach towards group homes in particularly stark terms: "the idea of the guys with torches and pitchforks coming off the bridge is much closer to the sentiment [in one neighborhood] than the oh, ho-hum we want to help some poor druggy for the tenth time go through the system."

character of our neighborhoods." Eight members were appointed to the IROC, including then-Mayor Rosansky, another council member, and Planning Commissioner Michael Toerge, as well as several private citizens.

The IROC's work culminated in a proposed ordinance that imposed a moratorium on establishing or operating any new "transitory uses" in a residential district for a period of 45 days, including group homes and short term lodgings. Angry citizens protested the freeze on the latter category, i.e., vacation homes. Craig Batley, a realtor and a member of the IROC, e-mailed City Council members to express the view that "the focus needs to be on Group Homes and only Group Homes." At a City Council meeting on April 24, 2007, citizens submitted a 400-signature petition against including short term lodgings in the moratorium. The City nevertheless enacted the moratorium as drafted. In a newspaper article published shortly thereafter, the City Attorney expressed the view that regulating only group homes would be discriminatory absent a showing that they caused different social problems than short-term lodgings.

In order to demonstrate that group homes did cause different social problems than vacation homes, the City conducted a citizen survey on the respective impacts of each type of housing. The City had never conducted a survey in connection with legislation before. The survey was distributed to four neighborhoods, three of which were the "[n]eighborhoods that seemed to generate the most complaints about [group homes]." One citizen opposed to group homes had one hundred surveys left on her doorstep to personally distribute.

The City Attorney prepared a report summarizing the 47 survey responses the City received and recommending that the City Council lift the moratorium with respect to vacation homes. The City Attorney's report also suggested amending the City Code to separately address problems caused by short-term lodgings, although the proposed amendments were never enacted. On May 30, 2007, the City Council passed Ordinance 2007-10 ("the revised Moratorium"), which followed the report's recommendation to lift the freeze on short-term lodging permits, but continued to prohibit new group homes. The revised Moratorium was renewed for an additional year on October 30, 2007. The district court found that the revised Moratorium was facially discriminatory because it singled out group homes for adverse treatment.

Around spring or fall of 2007, the City created an "Interdepartmental Group Homes Task Force," headed by Assistant City Manager David Kiff to "verify" the number and location of group homes in the City, and to enforce code violations against them, including violations of the then-applicable moratorium. The City hired James Sinasek to work with Kiff. During the second half of 2007, Sinasek investigated group homes by searching the internet to locate them and posing as a potential client. He visited suspected group home sites, observed the properties, and photographed residents, vehicles, and license plates at or around the properties. Both Kiff and Sinasek attended meetings at the homes of members of the Concerned Citizens of Newport Beach ("CCNB"), a citizen advocacy group opposed to group homes, at which CCNB members provided lists of additional suspected group home sites for Kiff and Sinasek to

investigate.[5]  As a result of this investigation, three group homes, including Pacific Shores, were cited for violating the revised Moratorium.

Meanwhile, City officials worked to amend the City's municipal zoning code.  At a Planning Commission meeting on June 21, 2007, the City Planner and outside counsel, Goldfarb & Lipman ("Goldfarb") presented a draft ordinance to the Commission.  The draft regulated both group homes and short-term lodgings because Goldfarb advised that doing so was necessary to avoid enacting an unlawful discriminatory ordinance.  Commissioner Toerge, a member of the IROC, argued that the City needed to "be more aggressive" because it was "inundated" with group homes; he endorsed an alternate draft prepared by attorneys employed by the CCNB.  Goldfarb subsequently prepared a memorandum explaining why the CCNB's proposed ordinance would be discriminatory.

Nonetheless, the City Planner prepared a revised ordinance that did not regulate short-term lodgings.  On September 20, 2007, an attorney from Goldfarb testified to the City Council that not regulating vacation homes might raise concerns about discrimination, and stated that "[t]here are still other non-conforming uses that are not necessarily residential care facilities [i.e., group homes].  We seem to not know exactly how many of those there are . . . but I think you grasp the situation that it does—it does change the overall impression."  Most public comments from City residents expressed frustration that the Commission had rejected as facially discriminatory the CCNB's more aggressive

---

[5] These lists included the meeting sites for members of Alcoholics Anonymous and Narcotics Anonymous.

ordinance.   Commissioner Toerge suggested that the Commission should not be considering legal discrimination concerns: "I mean save that for the courtroom."   The Planning Commission approved the revised draft.

While the Planning Commission was considering drafts of the Ordinance, the City Council formed an Ad Hoc Committee on Group Residential Legal Review whose sole purpose was to replace Goldfarb, the firm advising the City that failure to regulate short-term lodgings would be discriminatory, with new special counsel.  This Committee's work resulted in the city hiring new counsel, Richards, Watson, & Gershon PC, the firm that represents the City in this appeal.

On October 9, 2007, the City Council formed an additional Ad Hoc Committee on Group Residential Uses to work with new counsel on revising the draft ordinance that had been recommended by the Planning Commission.  The committee was chaired by Council Member Henn and included two other council members.  No such Committee had ever been formed by the city before and its meetings were not open to the public.

On January 8, 2008, the Committee proposed another draft ordinance to the City Council.   Unlike the draft approved by the Planning Commission, this one provided that hearing officers who were to adjudicate group homes' use permit applications were to consider as a factor the concentration of group homes in the neighborhood.  Council Member Henn defended the Ordinance against residents who wanted to limit the density of group homes even more explicitly.   He explained that the Ordinance had four objectives.  The first was to ensure that no new group homes

would open in Newport Beach: "Do you get my drift? No new ones anywhere unless an applicant can somehow prove a need for special accommodation under federal law." The second objective was to "assure that those homes that do operate in [the] community must meet the requirements of the stringent process and agree to strict operational guidelines or their permit will be revoked." Third, the City would "assure that there will be strict enforcement of the new ordinances going forward." The fourth objective was "to substantially relieve the existing overconcentration of group homes and their adverse impacts."

Henn continued: "We have carefully evaluated the idea of simply banning all unlicensed [group] homes in all but the multifamily areas of the Peninsula. The siren song of that solution was carefully evaluated, and unfortunately, as in so many facets of life, our ideal must be tempered by reality." He explained that "to do so would risk an immediately successful court challenge that would immediately enjoin the City from executing the ordinance . . . while we fight it in court." He concluded saying, "I believe that taken together these findings and requirements will, in fact, result in a substantial reduction in the number of group homes on the Peninsula. . . . *I ask you judge us by our actual results*."**[6]**

On January 22, 2008, the City Council met to approve the Ordinance and yet again confronted citizens who felt that the Ordinance should be even stricter and expressly regulate the concentration of group homes. Outside counsel explained that the approach adopted by the Ordinance—case-by-case

---

**[6]** Although Henn at one point stated that the City wished to ban unlicensed homes, the larger context of his remarks suggests that the City preferred to ban *all* group homes, both licensed and unlicensed.

analysis of each facility by a Hearing Officer—was harder to challenge in court than a strict limit on the density of group homes. Counsel assured the public that the Ordinance allowed "plenty of . . . hooks and standards for a [H]earing [O]fficer to apply [to deny a permit application]." Council Member Henn described the use permit process imposed by the Ordinance as "a very substantive attack" on the "issue of overconcentration [of group homes.]" Henn also pointed out that he was "not aware of any other city in the State of California that has adopted an ordinance that's as aggressive as [the City's] in terms of the location of new [group homes]." Then, immediately after Henn's comments, the City Council approved the Ordinance, which prohibits new group homes in most residential areas, requires existing group homes in those areas to submit to a burdensome permit process, and subjects those seeking to establish group homes in the limited areas in which they are still permitted to operate to the same onerous permit process.

## III

The Ordinance is codified as part of Title 20 of the City of Newport Beach Municipal Code ("NBMC"). Prior to the Ordinance's enactment, the City treated group homes as "single housekeeping units." "Single housekeeping units" are generally permitted to locate in all residential zones without any special permit. The Ordinance's key innovation was to amend the definition of "single housekeeping unit" to exclude group homes. This was accomplished in two critical ways: the amended definition added the requirements that (1) a single housekeeping unit have a single, *written* lease and (2) the  residents themselves must decide who will be a member of the household. As a result of these amendments, group homes no longer qualify as "single housekeeping units"

because the residents do not sign written leases and are chosen by staff (instead of by each other) to ensure the maintenance of a sober environment.[7]

Instead, under the Ordinance, group homes are now regulated as "residential care facilities"—i.e., facilities in which disabled individuals reside together but not as a "single housekeeping unit."[8]    NBMC  §  20.05.030(H)-(J).    As "residential care facilities," group homes now face significant restrictions on location, and otherwise, to which they were not subject prior to the Ordinance's enactment when they typically qualified as "single housekeeping units" and were able to operate freely in all residential areas.    Under the Ordinance, as "residential care facilities," new group homes may not locate in most residential zones under any circumstances, although they may locate in "multi-family" residential zones if they obtain a special use permit.    NBMC § 20.10.020.    Group homes that already existed in any

---

[7] A very small number of facilities are run by the residents alone, without the supervision of an operator, and thus may still qualify as "single housekeeping units."  Those few facilities might therefore remain unregulated by the Ordinance.  None of the Group Home Plaintiffs here fall in that category.

[8] The NBMC distinguishes between "general" residential care facilities (those with more than six residents) and "small" residential care facilities (those with six or fewer residents), although the difference is not relevant here.  California law requires that *licensed* facilities with six residents or fewer be treated as single-family dwellings for zoning purposes by all municipalities.  As a result such facilities are classified as "small licensed residential care facilities" under the NBMC and treated the same as single family homes.  All unlicensed residential care facilities, on the other hand, are "general residential care facilities" subject to the Ordinance, regardless of size.  Similarly, all licensed facilities with more than six residents are "general residential care facilities."

residential zone when the Ordinance was enacted and which were rendered nonconforming by the Ordinance, were required to apply for a special use permit within 90 days of its enactment in order to continue operating.   NBMC §§ 20.62.080(A)(4), 20.62.090, 20.91A.020.   Thus, the practical result of the Ordinance is that group homes are treated far less favorably than they were prior to the Ordinance's enactment.[9]

The extensive conditions and findings that a hearing office must make in order to issue a special use permit in a residential zone are set forth in NBMC § 20.91A.  Among other factors, the hearing officer must consider whether granting a permit to a particular residential care facility would be "compatible with the character of the surrounding neighborhood" and whether granting the use permit will result in a concentration of more than roughly 1–2 such

---

[9] As we explain in more detail, *infra*, the district court mistakenly relied on the fact that the Ordinance imposes even more restrictive regulations on other types of "group residential" living arrangements.  "Group residential" living arrangements, a classification that was newly introduced by the Ordinance, are "[s]hared living quarters, occupied by two or more persons not living together as a single housekeeping unit" and "include[], without limitation, boarding or rooming houses, dormitories, fraternities, sororities, and private residential clubs."   NBMC § 20.05.030(C). Such living arrangements, whether new or pre-existing, are flatly prohibited from existing in any residential zone.  There is no evidence, however, that more than a minimal number of "group residential" living arrangements existed in residential zones at the time that the Ordinance was enacted. NBMC §§ 20.05.030(C), 20.10.020.  In any event, it seems unlikely that any significant number of such establishments would have existed in the residential areas of Newport Beach.

facilities per block.[10]  NBMC § 20.91A.060(D).  Use permit denials may be appealed to the City Council under a substantial evidence standard of review.    NBMC § 20.91A.040.

Finally, the Ordinance also provides that the rules described above can be waived if a residential care facility can demonstrate that such waiver is a necessary "reasonable accommodation" for the disabled under federal or state fair housing laws.  NBMC, Chapter 20.98.  As with use permits, the Ordinance requires the hearing officer to consider whether the requested accommodation would "alter the character of the neighborhood," and the concentration of facilities in the neighborhood in question and the City as a whole.  NBMC § 20.98.025(C)–(D)

## IV

Council Member Henn had encouraged the public to judge the city by its results, and the results were significant. On May 23, 2008, three days after the 90-day deadline for pre-existing group homes to file a use permit application, the City served "abatement notifications" on every group home in the City that had not yet applied, including Pacific Shores. No abatement notices were sent to any other non-conforming business or individual although the City was aware of certain

---

[10] Because the Plaintiffs do not directly challenge the legality of permitting the hearing officer to consider the concentration of such facilities when granting or denying permits, we do not address that question.  *But see, e.g.*, *Larkin v. State of Mich. Dep't of Social Servs.*, 89 F.3d 285, 289–90 (6th Cir. 1996) (invalidating a spacing requirement for housing for the disabled); *Children's Alliance v. City of Bellevue*, 950 F. Supp. 1491, 1499 (W.D. Wash. 1997) (similar).

non-conforming commercial entities located in residential areas.[11]

Because they each had more than six residents, Pacific Shores, NCR, and Yellowstone were all classified by the City as "residential care facilities, general," and were therefore required to obtain a use permit or a reasonable accommodation in order to continue operating in residential zones. NBMC § 20.91A.020. The managers of all three facilities testified that the permit application process was burdensome, time-consuming, and costly, requiring hundreds of hours of staff time as well as tens of thousands of dollars in legal assistance to prepare and present the permit applications. The public hearings held regarding the Group Homes' permit applications were attended by City residents who repeated the same slurs and stereotypes about persons in recovery that had been common during prior public gatherings and yelled at the Group Homes' managers and attorneys.

On April 14, 2009, after two public hearings, the hearing officer denied Yellowstone's use permit and reasonable accommodation applications in their entirety, finding that Yellowstone was not qualified for a special use permit because it had not fully complied with zoning laws when it was first opened; the City Council affirmed that denial. NCR's applications for a use permit and reasonable accommodation were denied on September 17, 2009, in part because of its proximity to another group home, as well as a

---

[11] The City did serve abatement notices on some of these commercial entities on July 12, 2010, shortly after the Plaintiffs relied on the City's failure to enforce the Ordinance against these entities in their opposition to the City's summary judgment motion.

school, a day care facility, and a liquor store. NCR appealed to the City Council, obtained a remand, was denied again, and then appealed a second time, but was forced by economic pressures to close prior to having its second appeal heard.

On September 23, 2008, Pacific Shores submitted a reasonable accommodation application for 18 beds at each of its facilities, but did not apply for a use permit. The application was denied, and before its appeal could be heard, Pacific Shores submitted an amended reasonable accommodation request seeking to be allowed to continue operations at two of its three houses with a maximum of 12 residents per facility, instead of 18. That request was granted.

The Ordinance shut down other group homes. On July 30, 2008, Kiff gave a public presentation defending the Ordinance's efficacy. Kiff explained that the Ordinance had forced group homes "to fight, stay, or leave," and noted that of just over 600 group home beds in the City prior to the Ordinance, 220 were at facilities that would soon be required to close. According to Kiff, housing opportunities in group homes were set to decline by 40% citywide "with all of the use permit hearings yet to come." He commented that Pacific Shores was the City's "most aggressive challenger" and that "they [we]re not going quietly." Kiff ended his presentation stating that anti-discrimination laws "make[] me mad, too" but that "as long as I'm here, you have my commitment—and I know you do of the City Council—to trying to bring owner-occupied back to West Newport."

As Kiff predicted, by February 2009, more than 25 Group Homes—about one third of the number of Group Homes that had existed in 2007—had either closed or were pending closure. By March 2010, only four group homes had been

granted use permits; five others had obtained reasonable accommodations, including the two granted to Pacific Shores. No new group homes had opened since the Ordinance's enactment.[12]

The City's enforcement of the Ordinance against group homes was widely publicized in the press, on the internet, via a public letter from the City to residents, and on the City's website. The City's actions were particularly well known within the community of providers and therapists in Orange County and Southern California, and the City acknowledged as much in its communications with citizens. The managers and staff at the Group Homes spent substantial portions of their time contacting referral sources to assure them that, despite negative publicity, the Group Homes were not closing. Both Pacific Shores and NCR hired web consultants to improve their web ranking so that their webpages "appeared above web pages about the City's actions to close" them.

Each of the Group Homes experienced a dramatic decline in revenues of between 40% and 50% in the two years after the Ordinance's enactment. NCR closed in 2009 as a result of its declining business. In addition, as the City acknowledged at oral argument, prior to reducing its reasonable accommodation request to only 12 beds per homes, Pacific Shores had a higher occupancy rate at both of the two homes for which its request was granted, so it lost substantial revenue as a result of the new 12 bed limitation.

---

[12] Doing so would have been difficult. Under the limitations imposed by the Ordinance, only 33 out of 16,811 residential parcels in the City are possible sites for a new group home.

**PROCEDURAL HISTORY**

This is a consolidated appeal of two separate lawsuits resulting from the Ordinance's enactment and enforcement. Pacific Shores, its owner Alice Connor, and two Pacific Shores residents sued the City alleging discrimination under the federal Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), California Fair Employment and Housing Act ("FEHA"), and the Equal Protection Clause, as well as assorted other state and federal statutory and constitutional claims not at issue here. NCR and Yellowstone filed a separate suit alleging nearly identical claims. All of the Plaintiffs sought damages as well as declaratory and injunctive relief. The district court disposed of most of the Plaintiffs' claims in two separate summary judgment rulings.

First, the district court granted summary judgment to the City "with respect to [all of the] Plaintiffs' disparate treatment and selective enforcement claims brought under the FHA, ADA, FEHA, and the Equal Protection Clause," because the Plaintiffs failed to show that they were "treated differently than similarly situated non-disabled individuals in the enforcement of Ordinance 2008-5." In so doing, the court acknowledged "the large amount of evidence . . . regarding Newport Beach's allegedly discriminatory intent," but concluded that it was "irrelevant." However, the district court denied the City summary judgment as to Pacific Shores' claim that the Revised Moratorium was discriminatory, holding that it was facially discriminatory against group homes.[13]

---

[13] Pacific Shores was the only plaintiff to challenge the enforcement of the Revised Moratorium because it was the only plaintiff against whom it was enforced.

In a second summary judgment order, the district court dismissed all of the Group Homes' remaining claims for damages, determining that none of the Group Homes had demonstrated that any of the harm they suffered was caused by the Revised Moratorium or the Ordinance as opposed to other causes for which the City was not responsible, such as the downturn in the economy or hostility of City residents towards group homes. The district court also dismissed the two individual residents' damages claims, concluding that neither produced any evidence of having suffered compensable emotional distress.

In order to obtain a final judgment, the Plaintiffs voluntarily dismissed their remaining claims with prejudice, including their claims to injunctive relief under a disparate impact theory and their challenges to the City's adjudication of each Group Home's particular use permit and reasonable accommodation applications. The district court entered final judgment in favor of the City on March 14, 2011.

The Plaintiffs timely appealed for review of two issues: (1) "whether the district court erred in granting summary judgment against plaintiffs on their intentional discrimination claims despite substantial evidence that the City enacted a zoning ordinance for the purpose of discriminating against housing for disabled persons and enforced that ordinance to effect its discriminatory purpose" and (2) "whether the district court erred in granting summary judgment against plaintiffs, who were the targets of the discriminatory ordinance enacted and enforced by the City, on the grounds that plaintiffs could not show that the City was the cause of any of their injuries." We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *Balvage v. Ryderwood Improvement and Serv. Ass'n, Inc.*, 642 F.3d 765, 775 (9th Cir. 2011). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). When plaintiffs allege intentional discrimination under the ADA, FHA, or FEHA,[14] "any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (internal quotations marks and ellipses omitted).

## ANALYSIS

## I

## A

The Fair Housing Act renders it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter

---

[14] We do not separately discuss the Plaintiffs' state law fair housing claims from this point on because we "apply the same standards to FHA and FEHA claims." *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001).

because of a handicap[.]"[15] 42 U.S.C. § 3604(f)(1).  It is well established that persons recovering from drug and/or alcohol addiction are disabled under the FHA and therefore protected from housing discrimination.  *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803, 804 (9th Cir. 1994); *see* 42 U.S.C. § 3602(h).  It is equally well established that zoning practices that discriminate against disabled individuals can be discriminatory, and therefore violate § 3604, if they contribute to "mak[ing] unavailable or deny[ing]" housing to those persons.  *See id.* at 805; *see also Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 257 n.6 (1st Cir. 1993) (collecting cases and discussing legislative history); H.R. Rep. No. 100-711, at 24 (1988) (stating that amendments to the FHA to include protections against disability discrimination "also apply to state or local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps").  Finally, group homes such as the ones at issue here are "dwellings" under 42 U.S.C. § 3602(b), and therefore the FHA prohibits discriminatory actions that adversely affect the availability of such group homes.  *See, e.g.*, *Schwarz v. City of Treasure Island*, 544 F.3d 1202, 1213–16 (11th Cir. 2008); *Lakeside Resort Enters., LP v. Bd. of Superiors of Palmyra Twp.*, 455 F.3d 154, 160 (3d Cir. 2006); *Larkin*, 89 F.3d at 289.[16]

---

[15] Although the FHA refers to "handicap," hereinafter "we use the preferred term, 'disabled,' except when referring to the statutory language." *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 n.5 (9th Cir. 2008).

[16] The Group Homes have a cause of action, even though they are not themselves disabled individuals, because the FHA permits suit by anyone "aggrieved" by housing discrimination against the disabled. *See San*

The Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Like the FHA, this provision prohibits governmental entities from discriminating against disabled persons through zoning. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730–32 (9th Cir. 1999). Also like the FHA, the ADA's protections extend to persons recovering from drug or alcohol addiction.[17] *Hernandez v. Hughes Missile Systems Co.*, 362 F.3d 564, 568 (9th Cir. 2004). The standards regarding disparate treatment claims under the ADA are typically identical, and courts accordingly "interpret them in tandem," as we do here. *Tsombanidis v. West Haven Fire Dep't.*, 352 F.3d 565, 573 n.4 (2d Cir. 2003).[18]

---

*Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998); 42 U.S.C. § 3613 (same).

[17] The ADA provides the Group Homes with a cause of action, even though they are not themselves disabled. *See, e.g.*, *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002); 42 U.S.C. § 12133 (extending a cause of action to "any person alleging discrimination on the basis of disability").

[18] In addition to prohibiting intentional discrimination, both the FHA and the ADA also require public entities to grant such "reasonable accommodations" as are necessary to provide equal housing opportunities to disabled individuals. *See, e.g.*, *id.* at 573; *McGary v. City of Portland*, 386 F.3d 1259, 1261–62 (FHA), 1269 (ADA) (9th Cir. 2004). On appeal, presumably because they challenge the Ordinance as a whole rather than the City's failure to grant their individual reasonable accommodation requests, the Plaintiffs have proceeded primarily based upon a disparate treatment theory.

Quite properly, the City does not challenge any of these foundational principles.  Instead, the primary liability-phase question presented here is whether the district court properly dismissed the Plaintiffs' disparate treatment claims for failure to demonstrate that any similarly situated entity was treated worse than the Plaintiffs under the Ordinance.  The Plaintiffs argue that it was error to disregard the large amount of evidence in the record suggesting that the Ordinance was enacted for the discriminatory purpose of harming group homes and thereby limiting the housing opportunities available to individuals recovering from addiction.  We now turn to that question.

## B

Our cases clearly establish that plaintiffs who allege disparate treatment under statutory anti-discrimination laws need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail.  *See, e.g.*, *Budnick*, 518 F.3d at 1114; *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (same in Title VII context).[19]  Proving the existence of a similarly situated entity is only *one* way to survive summary judgment on a disparate treatment claim.  *See*

---

[19] The standards of proof required for the Plaintiffs' FHA, ADA, and FEHA disparate treatment claims are identical, and are all drawn largely from Title VII cases.  *See Budnick*, 518 F.3d at 1114 (Title VII standards apply to FHA claims); *Walker*, 272 F.3d at 1131 n.8 (FHA standards apply to FEHA claims); *Hernandez*, 362 F.3d at 568 (Title VII standards apply to ADA claims).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[20]
A plaintiff does not, however, have to rely on the *McDonnell
Douglas* approach to create a triable issue of fact regarding
discriminatory intent in a disparate treatment case. *See Costa
v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) (en
banc), *aff'd*, 539 U.S. 90 (2003). Instead, he may "simply
produce direct or circumstantial evidence demonstrating that
a discriminatory reason more likely than not motivated" the
defendant and that the defendant's actions adversely affected
the plaintiff in some way. *McGinest*, 360 F.3d at 1122; *see
also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111,
121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable
where the plaintiff presents direct evidence of
discrimination."); *Lowe v. City of Monrovia*, 775 F.2d 998,
1006–07 (9th Cir. 1985), *amended on other grounds*,
784 F.2d 1407 (9th Cir. 1986).

When plaintiffs rely on the "direct or circumstantial
evidence" approach, instead of *McDonnell Douglas*, to
survive summary judgment, we turn to the "sensitive" multi-
factor inquiry articulated by the Supreme Court in *Arlington
Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266
(1977), to determine whether the plaintiffs have created a
triable issue of fact that the defendant's actions were
motivated by discriminatory intent. *See Gay v. Waiters' &*

---

[20] In *McDonnell Douglas*, the Supreme Court set forth a burden shifting
mechanism explaining how a plaintiff could survive summary judgment
based on the treatment of a similarly situated entity. Under *McDonnell
Douglas*, a plaintiff establishes a *prima facie* case of discrimination by
showing that he was treated worse than such an entity. *Id.* at 1824. The
burden then shifts to the defendant to present a legitimate reason for the
allegedly discriminatory action. *Id*. Finally, the plaintiff bears the
ultimate burden of demonstrating the explanation is pretextual. *Id.* at
1824–25.

*Dairy Lunchmen's Union*, 694 F.2d 531, 550 (9th Cir. 1982) (applying *Arlington Heights*).[21]   Under *Arlington Heights*, a court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history."   429 U.S. at 266–68; *see Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (applying the *Arlington Heights* factors).   These factors are non-exhaustive.   *Arlington Heights*, 429 U.S. at 268.  When a plaintiff opts to rely on the *Arlington Heights* factors to demonstrate discriminatory intent through direct or circumstantial evidence, the plaintiff need provide "very little such evidence . . . to raise a genuine issue of fact . . . ; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder."   *Schnidrig v. Columbia Mach, Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (quoting *Lowe*, 775 F.2d at 1009).

---

[21] The *Arlington Heights* test was developed to detect discriminatory animus in the context of a Fourteenth Amendment equal protection claim. However, it is well established that the *Arlington Heights* factors also provide one way for a plaintiff who alleges statutory discrimination to establish discriminatory intent.  *See id.; accord Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010) (applying the *Arlington Heights* factors to discern whether a county acted with discriminatory intent in the FHA context); *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1283–84 (11th Cir. 2006) (same); *Tsombanidis*, 352 F.3d at 579 (same in FHA and ADA contexts).

The district court nonetheless refused to consider the "large amount of evidence submitted by Plaintiffs regarding Newport Beach's allegedly discriminatory intent." Although it purported to acknowledge that plaintiffs in an anti-discrimination lawsuit need not demonstrate the existence of a similarly situated entity, we see no way of interpreting the district court's position as anything other than a suggestion that a plaintiff can establish a *prima facie* case of intentional discrimination only by using the *McDonnell-Douglas* burden shifting construct.    As described above, we have unambiguously rejected this position previously, and we do so again now. *McDonnell-Douglas* simply *permits* a plaintiff to raise an inference of discrimination by identifying a similarly situated entity who was treated more favorably. It is not a straightjacket *requiring* the plaintiff to demonstrate that such similarly situated entities exist.

This case demonstrates why requiring anti-discrimination plaintiffs to prove the existence of a better-treated entity would lead to unacceptable results. According to the district court's theory, Plaintiffs in anti-discrimination suits would be unable to demonstrate the discriminatory intent of a defendant that openly admitted its intent to discriminate, so long as the defendant (a) relies on a facially neutral law or policy and (b) is willing to "overdiscriminate" by enforcing the facially neutral law or policy even against similarly-situated individuals who are not members of the disfavored group. Such a rule presents the "grotesque scenario where a[] [defendant] can effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated

[entities] are victimized."[22]  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

This "grotesque scenario" is not the law.  *Id.*  A willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination; it simply underscores the depth of the defendant's animus.  *See, e.g.*, *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 231 (1964) (holding that although a county has the legal power to close all of its public schools, it could not do so for the purpose of preventing children from attending desegregated schools).  As one district court observed in a case quite similar to this one, "that an ordinance also discriminates against individuals unprotected by the FHA does not eliminate a FHA violation." *Children's Alliance*, 950 F. Supp. at 1496 n.8.[23]

---

[22] Another possibility where no similarly situated entity will be available is where the nature of the defendant's discrimination is such that no such entity *could* exist.  For example, in *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001), Native Americans alleging that state police officials deliberately provided reduced police services on reservations were not required to show that similarly situated groups were better treated because it would be impossible to identify any other group "whose situation is similar to Native Americans living on a reservation and exercising a substantial measure of self-government independent of New York State."

[23] *Children's Alliance* involved the use of a "proxy classification," a variation on the overdiscrimination theme.  Proxy discrimination is a form of facial discrimination.  It arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.  For example, discriminating against individuals with gray hair is a proxy for age discrimination because "the 'fit' between age and gray hair is sufficiently close."

The principle that overdiscrimination is prohibited undergirds all of constitutional and statutory anti-discrimination law, although it often goes unsaid precisely because it is so foundational. Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals.

*Arlington Heights* itself relies on the assumption that overdiscrimination is illegal. The issue in *Arlington Heights* was whether a Chicago suburb's denial of a rezoning application for construction of an affordable housing complex was racially motivated. *Arlington Heights*, 429 U.S. at 259. Although on the facts of the case the Court held that the evidence did not support the Plaintiffs' allegations that a discriminatory motive was at work, the Court's analysis presumed that the Plaintiffs would have prevailed *if* they had demonstrated that Arlington Heights denied the rezoning application in order to limit housing opportunities for minorities. *See id.* at 270. This would have been so even though the racial minorities who were denied housing opportunities would not have been treated any worse than the

---

*McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992). The difference between proxy discrimination and facially neutral overdiscrimination is merely one of degree. In a case of proxy discrimination the defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group. By contrast, facially neutral overdiscrimination arises when the defendant exhibits a willingness to distinguish amongst individuals on the basis of facially neutral criteria, knowing (but accepting) that some individuals who are not members of the disfavored group will suffer alongside the targeted individuals.

low-income white individuals who would also have been deprived of the same housing opportunities.

Similarly, in *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court unanimously struck down a provision of the Alabama constitution that disenfranchised individuals convicted of crimes involving moral turpitude. The provision was facially neutral because it applied to persons of all races. *Id.* at 227. However, there was compelling evidence that the provision was adopted at the turn of the 20th century for the purpose of disenfranchising black voters who were convicted of such crimes at a far higher rate than white voters. Assuming, *arguendo*, that the disenfranchisement provision would be constitutional if it were passed in modern times without the intent to discriminate against racial minorities, the Court nonetheless held that because it had been enacted for a discriminatory purpose it "violates equal protection under *Arlington Heights*." *Id.* at 233. The 1903 Alabama legislature's willingness (or intent) to also disenfranchise white individuals convicted of crimes of moral turpitude was irrelevant; all that mattered was that the act "would not have been adopted . . . in the absence of the racially discriminatory motivation."[24]  *Id.* at 231.

---

[24] The City's and its amicus' reliance on *United States v. O'Brien*, 391 U.S. 367 (1968), for the proposition that courts may not invalidate a law that was motivated by animus purely on the basis of the legislature's intent is therefore misplaced. *O'Brien* does not apply to equal protection cases or cases involving statutory anti-discrimination law where the very nature of the legal inquiry is whether an action taken by the legislature was motivated by animus. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377 n.6 (1991) (making this point and citing *Arlington Heights*); *see also Church of the Lukumi Babalu Aye, Inc.*

More recently, in *City of Modesto*, this court held that several unincorporated majority-Latino neighborhoods had created a triable issue of fact that they had been victims of disparate treatment on account of their racial composition. The communities had not been included in a tax sharing agreement between the county in which they were located and the City of Modesto while communities with a majority-white populations were included in the agreement. *City of Modesto*, 583 F.3d at 697. Neighborhoods party to the agreement were more likely to be annexed by Modesto at some point in the future. *Id.* at 703–04. Modesto argued that the excluded neighborhoods could not maintain an intentional discrimination claim because the excluded communities had significant white populations, and those white residents would also suffer as a result of the alleged discrimination. We rejected that argument, concluding that the relevant question was whether the excluded neighborhoods were treated differently because of their *overall* racial composition, not whether Modesto's discriminatory actions would affect *only* racial minorities. *See id.* at 704. In other words, Modesto's willingness to discriminate against both minorities *and* white citizens living in majority-minority communities did not cleanse it of any discriminatory intent that it may have harbored.

Other Circuits have similarly condemned instances of overdiscrimination. For example, in *Town of Clarkton v. NAACP*, 682 F.2d 1055 (4th Cir. 1982), the Fourth Circuit held that Clarkton had intentionally discriminated against African Americans when it withdrew from a multi-county

*v. City of Hialeah*, 508 U.S. 520, 535 (1993) (subjecting to heightened scrutiny a law whose "object" was to discriminate on the basis of religion).

affordable housing project in response to white residents' racially driven hostility to the project. This analysis was not changed by the fact that the abandonment of the project had "an effect touching upon *all* citizens" of the county. *Id.* at 1066. Rather, because "it is the black population that will suffer . . . in a disproportionate manner," the town's actions were still discriminatory. *Id.* at 1066 (emphasis added). Similarly, in *Abdu-Brisson*, the Second Circuit held that an airline could be guilty of age discrimination if it intentionally imposed unfavorable employment conditions upon all of the employees it inherited after its purchase of a competitor airline in order to discriminate against the portion of the inherited employees who were elderly. 239 F.3d at 467–68.

Here, the district court relied on *Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997); *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008); and *Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996), in concluding that plaintiffs in disparate treatment suits must identify a similarly situated entity. None of these cases supports such a proposition. In *Gamble*, we relied in part on the absence of a similarly situated entity to dismiss a case *proceeding under a McDonnell Douglas theory*. 104 F.3d at 305. *Gamble* therefore has no application here. As to *Schwarz* and *Oxford House*, both cases, unlike this one, involved the enforcement of *pre-existing*, facially neutral zoning laws against group homes, and neither case involved any suggestion that the zoning laws in question had been enacted with a discriminatory purpose. *Schwarz*, 544 F.3d at 1206–11, 1216; *Oxford House-C*, 77 F.3d at 252. Accordingly, again, neither case is relevant here.

In fact, *Schwarz* expressly acknowledged that its "analysis might have been different if [the group home] claimed that the City enacted the [zoning law] in order to discriminate against people with disabilities." *Id.* at 1217. This precise situation arose shortly thereafter. In *Caron Found. of Florida Inc. v. City of Delray Beach*, 879 F.Supp. 2d 1353 (S.D. Fla. 2012), a district court confronted exactly the circumstances foreseen in *Schwarz*. In *Caron*, the City of Delray enacted a zoning ordinance much like the one in *Schwarz*, but there was evidence that Delray's ordinance was enacted in reaction to an increase in group homes and with the intent to discriminate against them. *Caron*, 879 F.Supp. 2d at 1361–63, 1367–70. Applying *Schwarz*, the district court in *Caron* correctly, in our view, determined that the zoning laws in question were discriminatory in light of their apparent discriminatory purpose. The circumstances in *Caron* are nearly identical to the ones alleged in this case. *See also Nevada Fair Housing Ctr. v. Clark Cnty.*, 565 F. Supp. 2d 1178 (D. Nev. 2008).

## C

Had the district court applied the proper analysis under *Arlington Heights*, it would have necessarily concluded that the Plaintiffs' claims survive summary judgment. Taken in the light most favorable to the non-moving party, the legislative history indicates that the Ordinance was enacted for the purpose of eliminating or reducing the number of group homes throughout the City. The Plaintiffs have come forward with statistics, *provided by the City*, that the Ordinance had the effect of reducing group home beds by 40%. The Plaintiffs also provided evidence that group homes were specifically targeted for enforcement. The City created a task force to locate group homes, undertake surveillance of them, and enforce the zoning code strictly against them.

After the Ordinance was enacted, every nonconforming group home in the City that did not apply for a use permit was served with an abatement notice within three days of the 90-day use permit application deadline, whereas no abatement notices were sent to any other entities engaged in a nonconforming use until the Plaintiffs pointed out those entities during the litigation.

All of the circumstances surrounding the enactment of the Ordinance compel the conclusion that the Plaintiffs have raised a triable issue of fact as to whether the Ordinance was motivated by the desire to discriminate against the disabled. The Ordinance was designed to replace the amended Moratorium, which the district court held to be facially discriminatory because it expressly treated group homes worse than short-term lodgings. Although the Ordinance, unlike the amended Moratorium, was facially neutral, the Plaintiffs have provided evidence that it had (and, according to Council Member Henn, was designed to have) the same effect on group homes as the Moratorium: It ensured as a practical matter that no new group homes opened in Newport Beach.

Council Member Henn also promised that the Ordinance would reduce the number of pre-existing group homes. At the same meeting, Council Member Henn explained that the drafters of the Ordinance would have preferred to simply ban all group homes, but that only a facially neutral Ordinance stood any hope of surviving the anticipated legal challenge. In response to criticism from residents that the Ordinance was not a blunt enough instrument to rapidly expel group homes from the City, Henn urged the critics to "judge us by our actual results." Nonetheless, because of pressure from citizens who owned short-term lodgings, the City Council

made the ordinance narrower than outside counsel, Goldfarb, had initially advised. Goldfarb was fired, and the final Ordinance was drafted with the assistance of new counsel who consulted with the CCNB to develop an Ordinance that applied to a much narrower selection of facilities. *Cf. Church of the Lukumi Babulu Aye, Inc. v. City of Hialea*, 508 U.S. 508, 538–41 (1993) (describing as a "religious gerrymander" a city's enactment of facially neutral regulations regarding animal slaughter that had the (intended) effect of prohibiting Santeria worship, while simultaneously permitting exceptions that allowed other types of animal slaughter carried out by more favored groups).[25] In short, a jury could find, based on the record before us, that the primary purpose of the Ordinance was to shut down group homes and prevent new ones from opening in Newport Beach, but to do so in facially neutral terms to avoid invalidation by a court.[26]

---

[25] Although *Lukumi Babulu* was a Free Exercise case, rather than a statutory discrimination challenge under the FHA, the Court's analysis of discriminatory intent in *Lukumi Babulu* was guided in part by the *Arlington Heights* factors. *Lukumi Babalu*, 508 U.S. at 540.

[26] The foregoing account of the City's legislative motive does not examine the role that City residents' animus played in bringing about the Ordinance. Every public meeting leading up to the City Council's ultimate enactment of the Ordinance was marked by angry comments from citizens who referred to the disabled residents of the group homes as "criminals," "gang members," "druggies," "not true handicapped" and other derogatory terms. The record suggests that City Council members were responsive to the public's views.

It is beyond dispute that legislatures may not "defer[] to the [discriminatory] wishes or objections of some fraction of the body politic." *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). A jury could certainly infer from this record that private citizens' "hostility motivated the City in initiating and continuing its enforcement efforts." *Tsombanidis*, 352 F.3d at 580; *see also Metoyer v.*

A jury could also conclude that the Ordinance was designed to eliminate group homes rather than to serve as a neutral amendment to the City's zoning laws. The Ordinance amended the definition of "single housekeeping unit" to exclude living arrangements in which residents (1) are not all signatories to a single written lease and (2) do not choose their own housemates. NBMC § 20.03.030. These characteristics subject group homes, but not vacation homes, to a more restrictive zoning regime. To be sure, the Ordinance affects adversely some other facilities that are not group homes. "Group residential" arrangements such as "boarding or rooming houses, dormitories, fraternities, sororities, and private residential clubs" are now completely prohibited in residential zones. NBMC § 20.05.030(C). The record, however, includes evidence that this aspect of the Ordinance has been enforced against few, if any, facilities. Therefore it appears either to be the case that very few "group residential" facilities that were not group homes existed when the Ordinance was enacted, or if such facilities existed, the City did not enforce the Ordinance against them. In either case, all group homes were ultimately affected by the Ordinance and few other facilities were.

Finally, the City engaged in three notable procedural irregularities leading up to the enactment of the Ordinance. First, it created an ad hoc committee that met privately and off the record, something the City had never done before, to

---

*Chasman*, 504 F.3d 919, 938 (9th Cir. 2007) (noting that discrimination arises in the Title VII context when a third-party's animus "affected" the decisionmaker).

work with new counsel to draft the Ordinance.[27]  Second, the City conducted a survey that was distributed primarily to individuals opposed to group homes, to justify regulating group homes differently from short-term lodgings.[28]  Third, even prior to the Ordinance's enactment, a City task force was formed to work with City residents to strictly enforce the zoning code against group homes.

In short, applying the *Arlington Heights* factors to the evidence in this record, it is clear that the Plaintiffs have met their burden to create a triable issue of fact as to whether the Ordinance was enacted with a discriminatory purpose of harming group homes and, therefore limiting the housing

---

[27] The Plaintiffs suggest that having committee meetings in private violated California's open meeting law, Cal. Gov't Code § 54952.2.  This appears to be incorrect.  Section 54952.2 prohibits private meetings of a "majority of members of a legislative body."  *Id.*  The ad hoc committee had three members, whereas the Newport Beach City Council appears to have seven members (one of whom serves as Mayor).  *See* http://www.newportbeachca.gov/index.aspx?page=74 (last visited Oct. 27, 2012).

[28] The City did not rely on objective measures, such as the number of formal police complaints about activities at group homes, as a basis for enacting the Ordinance.  In fact, a memo from Goldfarb states that vacation homes generate more calls to the police than group homes, and a letter submitted to the City by a group home that is not a plaintiff here provided statistics showing that its facility had generated *fewer* calls for service than other residential units on the same block and fewer calls for service than had been the case at the same property prior to the opening of the group home.

options available to disabled individuals recovering from addiction.[29]

## D

The City argues that the Plaintiffs cannot show that they suffered any adverse effects as a result of its actions, even if those actions were motivated by discriminatory intent, because, on appeal, the Group Homes have not challenged the City's denial of their individual permit applications. The City fails to appreciate that it was the imposition of the Ordinance itself that triggered the Plaintiffs' alleged injuries. We have recognized that it is unlawful discrimination to subject individuals to "the rigors of the governmental or administrative process . . . with an intent to burden, hinder, or punish them by reason of their [membership in a protected class.]" *Flores v. Pierce*, 617 F.2d 1396, 1391 (9th Cir. 1980) (Kennedy, J.), *cert. denied*, 449 U.S. 875 (1980).

That is what is alleged to have happened here. Prior to the Ordinance, group homes were classified as single housekeeping units and therefore were able to operate freely in residential zones, subject only to the restrictions that governed other residences. After the Ordinance's enactment, however, every group home was required to submit a detailed application for a special use permit and/or reasonable accommodation in order to continue operating and to attend

---

[29] For similar reasons, we also agree with the Plaintiffs that they created a triable issue of fact with respect to their discriminatory enforcement claims. The evidence that the Ordinance was enacted with discriminatory intent also provides support for the Plaintiffs' claim that the City's enforcement strategy was similarly calculated to accomplish a discriminatory goal, as does the City's actual enforcement strategy.

public hearings at which those applications were subjected to public comment.[30]  Subjecting an entity protected by anti-discrimination laws to a permit or registration requirement, when the requirement is imposed for a discriminatory purpose, has obvious adverse impacts upon that entity, and being forced to submit to such a regime is sufficient to establish injury in a disparate treatment claim.  *See Flores*, 617 F.2d at 1391.  This would be true even if such permits were granted freely, which is decidedly not the case here.

Plaintiffs have introduced evidence that the Ordinance had at least two kinds of adverse effects upon them, either of which would be sufficient to allow them to maintain an action under the FHA or ADA.  First, the unrebutted evidence shows that the Group Homes expended substantial time, effort, and resources applying for special use permits and reasonable accommodations, none of which would have been necessary had the Ordinance not been enacted.  *See, e.g.*, *Walker*, 272 F.3d at 1124–25 (staff time spent responding to intentionally discriminatory actions by a municipality is an injury sufficient to confer standing under the FHA and FEHA).  Second, Plaintiffs have produced evidence that the Ordinance led to the closure of approximately one third of the City's Group Homes and barred new group homes from being established in all but multi-family residential zones.  This resulted in a reduced diversity of housing options for the disabled individuals served by group homes.  *See Olmstead*

---

[30] Although the reasonable accommodation process ostensibly allowed exceptions to the City's zoning policy that would be consistent with state and federal anti-discrimination laws, it was as complex, time-consuming, and restrictive as the special use permit process.  *Compare* NBMC Chapter 20.91A (use permit application process), *with* NBMC Chapter 20.98 (reasonable accommodation application process).

*v. L.C. ex re. Zimring*, 527 U.S. 581, 599–600 (1999) (recognizing that segregation of the disabled is an injury protected by the ADA).  For these reasons, the City's waiver argument based upon the fact that the Group Homes no longer challenge the City's denial of their permit applications is irrelevant.  The Plaintiffs show they were harmed by the imposition of the discriminatory permit regime, and this is more than sufficient for them to maintain a claim for disparate treatment based upon the imposition of the permit requirement itself.[31]

The City's argument that the Plaintiffs cannot use statistical evidence to demonstrate that the Ordinance discriminated against them simply because they voluntarily dismissed their disparate impact claims is also unavailing.  First, the City misdescribes the posture of this case.  The Plaintiffs voluntarily dismissed their claim *to injunctive relief* under a disparate impact theory, but did not dismiss their claims to damages under that theory.  Those damages claims were dismissed by the district court in the second summary judgment order relating to damages, and the Plaintiffs have appealed that ruling.  Second, even if the Plaintiffs had waived their disparate impact claims in their entirety, the City

---

[31] The City's argument as to Pacific Shores is slightly different, but equally without merit.  According to the City, Pacific Shores did not suffer any adverse effects as a result of the Ordinance because it was granted a reasonable accommodation for twelve beds.  This argument suffers from the same defect: the very requirement to apply for a reasonable accommodation adversely affected Pacific Shores. Just as plaintiffs in a discrimination action need not have applied for a permit in order to allege that a permit requirement is discriminatory, *see City of Modesto*, 583 F.3d at 705 n.7, so too may plaintiffs challenge a discriminatory permit regime even if they begrudgingly apply for a permit in order to minimize the harm they suffer under that regime.

is plainly wrong that their waiver of those claims would prevent them from using statistical evidence that *also* would have been helpful to prove disparate impact to demonstrate discriminatory intent. *See Arlington Heights*, 429 U.S. at 265 (noting that disparate impact "is not irrelevant" to proving intentional discrimination); *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007) (discriminatory acts towards third parties may be used to show actions taken against the plaintiff were motivated by discrimination); *Lowe*, 775 F.2d at 1008 (9th Cir. 1985) (statistical evidence can be used to show disparate treatment); *Costa*, 299 F.3d at 860 (noting that motive can "in some situations be inferred from the mere fact of differences in treatment" (internal quotation marks omitted)). A single piece of evidence can support multiple theories of liability. Thus, all of the City's waiver arguments fail.

## II

Finally, we turn to the district court's second summary judgment order, in which it dismissed all of the Plaintiffs' claims for damages on the ground that they "cannot establish that any action taken by the City was the actual and proximate cause" of any economic harm suffered by the Plaintiffs. The Group Homes argue that they submitted sufficient evidence to survive summary judgment with respect to whether the City caused them to incur three separate categories of damages: (1) costs of complying with the Ordinance, i.e., diverted staff time and legal expenses; (2) lost income as a result of the business climate resulting from the Ordinance; and (3) costs associated with counteracting the impression that the Group Homes were being shut down by the City. In addition, the individual Plaintiffs argue that they created a triable issue of fact as to whether they suffered

compensable emotion distress.  Because most of the Plaintiffs created a triable issue of fact regarding each type of damage, we reverse, except with respect to the district court's determination that Bridgeman failed to create a triable issue of fact as to whether she suffered compensable emotional distress.

## A

The Group Homes' respective managers provided sworn declarations indicating that hundreds of hours of their own time and their staffs' time was diverted to preparing the complex applications necessary to request a use permit and/or reasonable accommodation.  Each of the Group Homes also expended significant legal fees preparing its applications and challenging the denials of those applications to the City Council.  These expenditures were plainly caused by the enactment and enforcement of the Ordinance, and they are recoverable.

Diverted staff time is a compensable injury.  *See Walker*, 272 F.3d at 1124–25; *see also Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785–86 (9th Cir. 1982); *cf. Fair Housing of Marin v. Combs*, 285 F.3d 899, 903–04 (9th Cir. 2002) (holding that an organizational plaintiff suffered injury sufficient to confer Article III standing where it diverted staff resources to combating FHA violations).  As we explained in *Convoy Company*, "[t]he issue is not whether [the Plaintiffs] would have paid the [employees'] salaries" absent the defendant's wrongdoing, but, rather, whether the Plaintiffs were "deprived of the services [they] paid for" because of the need for the employees to divert their attention to minimize the damage from the defendant's misconduct.  672 F.2d at 785.  The staff time spent preparing and presenting permit

applications under the Ordinance would have otherwise been spent promoting the Group Homes' business and serving their residents. This diversion of time therefore represents a loss for which the Group Homes may recover. *Walker*, 272 F.3d at 1124–25.

The Group Homes may also recover the legal costs they spent preparing their permit and reasonable use applications and presenting those applications before City hearing officers and the City Council. The district court's conclusion that such costs were "better resolved" through an application for attorney's fees was, therefore, erroneous. We have held that attorney's fees may be recovered as damages in a civil rights action where the fees were necessary to obtain a permit in a proceeding that only occurred as a result of city officials' discriminatory animus. *See Flores*, 617 F.2d at 1392 (9th Cir. 1980); *accord Sherwin Manor Nursing Ctr. v. McAuliffe*, 37 F.3d 1216, 1221–22 (7th Cir. 1994). In *Flores*, Judge (now Justice) Kennedy upheld an award of attorney's fees, as damages, to § 1983 plaintiffs for the legal services necessary to combat the city's challenge to the plaintiffs' liquor license application where city officials had deliberately delayed the application because of racial animus. 617 F.2d at 1388, 1392; *see also Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (holding that a § 1983 plaintiff could recover attorney's fees as damages where those fees were incurred defending against criminal charges that directly resulted from the defendant police officer's wrongful arrest of the plaintiff). Just as the plaintiffs in *Flores* and *Barlow* were entitled to attorneys fees spent combating wrongfully instituted legal proceedings, so too may the Group Homes here recover the attorney's fees necessary to comply with the use permit requirement that the City imposed for an allegedly discriminatory reason.

## B

The district court acknowledged that the Group Homes experienced a dramatic decline in business shortly after the enactment of the Ordinance.  It found, however, that the Plaintiffs did not adequately raise a triable issue of fact as to whether the City's actions caused these business losses.  In reaching this determination, the district court misapplied well-established principles of causation and failed to draw every inference in the Group Homes' favor, as it was required to do at the summary judgment stage.

We begin with the principle that a "damages action under the FHA sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Garcia v. Brockway*, 526 F.3d 456, 464 (9th Cir. 2008) (en banc) (brackets omitted) (quoting *Curtis v. Loether*, 415 U.S. 189, 195 (1974)); *see also Henrietta D v. Bloomberg*, 331 F.3d 261, 278–79 (2d Cir. 2003) (applying common law tort principles of causation to the ADA). Accordingly, general tort principles of causation usually govern statutory discrimination cases except when there is a statutory command to the contrary.  *See, e.g.*, *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814, 819–21, 824–25 (9th Cir. 2001) (applying general tort principles to the calculation of damages under the FHA); *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234–35 (D.C. Cir. 1997) (same).

At tort, plaintiffs bear the burden of demonstrating that the defendant's conduct caused some harm suffered by the plaintiffs.  However, the plaintiffs are "not required to eliminate entirely all possibility that the defendant's conduct

was not a cause.  It is enough that [they] introduce[] evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it is not."  Restatement (Second) of Torts § 433B, cmt. b (1965) (hereinafter "Restatement").    Moreover, "[t]he plaintiff doesn't have to prove a series of negatives; he doesn't have to 'offer evidence which positively excludes[s] every other possible cause of the accident.'" *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th Cir. 2011) (quoting *Carlson v. Chisholm-Moore Hoist Corp.*, 281 F.2d 766, 770 (2d Cir. 1960) (Friendly, J.)), *cert. denied*, 132 S. Ct. 253 (2011).  Rather, plaintiffs can demonstrate causation by proving that the defendant's wrongful conduct was a "substantial factor" in bringing about the harm in question.  Restatement § 431(a); *see also Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992) (describing the "substantial factor" test as a "uniformly accepted principle[] of tort law").  The doctrine of proximate cause serves merely to protect defendants from unforeseeable results of their negligence when "too many unexpected things [have] happen[ed] between the defendant's wrongdoing and the plaintiff's injury."[32]  *BCS Services*, 637 F.3d at 754.

---

[32] The fact that FHA plaintiffs' injuries must be proximately caused by the defendant's discriminatory acts does not, of course, mean that defendants are not liable for foreseeable, but indirect, effects of discrimination.  For example, in *Silver Sage* we held that a city that wrongfully withheld its approval of a fair housing project could be held liable not just to the developers of the project for their lost profits, but also to a real estate broker and a businessman who, respectively, did not receive broker's fees and syndication fees that would have been paid had the project gone forward.  251 F.3d at 822–23; *see also San Pedro Hotel Co.*, 159 F.3d at 475.

Causation is an intensely factual question that should typically be resolved by a jury. *See, e.g.*, *White v. Roper*, 901 F.2d 1501, 1505–06 (9th Cir. 1990) (citing W. Prosser & W. Keeton, *The Law of Torts*, §§ 41, 42, 45 (5th ed. 1984)); Restatement § 434(2). Juries are expected to rely on their common sense in resolving questions of causation. Indeed, it is jurors' "common experience of living on a populated planet" that renders them at least as reliable, if not more so, than a single judge at assessing issues of causation. David W. Robertson, *The Common Sense of Cause In Fact*, 75 Tex. L. Rev. 1765, 1769 (1997). As the Seventh Circuit has recognized, "[o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation." *BCS Services*, 637 F.3d at 758. Contrary to the Plaintiffs' suggestion, these principles are not a matter of burden-shifting—plaintiffs always bear the burden of proving that the defendant's actions caused their injuries—but rather a simple recognition that making reasonable inferences about causation is one of the things that juries do best.

We applied these principles in *Mead v. Retail Clerks Int'l Assoc., Local Union No. 839*, 523 F.2d 1371 (9th Cir. 1975), when we held that a trier of fact could infer that a union's illegal strike had "materially contributed" to the employer's lost sales (and therefore was a substantial factor in bringing the loss about) because the "injury alleged . . . was precisely the type of loss that the claimed violations . . . would be likely to cause." *Id.* at 1378 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969)). This was so even though the union, much like the City in this case, argued that it was equally likely that the lost sales were

attributable to adverse business conditions and negative publicity regarding the employer's labor practices.  *Id.* at 1376.

Although *Mead* drew this principle from cases arising in the anti-trust context, we recognized that these anti-trust cases merely "incorporat[e] common law principles of causation," albeit with appropriate modifications.  *Id.*  Further, just as in *Mead*, here, there is "an exact parallel between the problem faced by a plaintiff attempting to show that lost profits resulted from anti-competitive activity rather than from other factors affecting the business," and the problem faced by the Group homes in attempting to prove that their losses were caused by the defendant's alleged intentional discrimination. *Id.* at 1378.  In both kinds of cases, "damage issues . . . are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."  *Id.* at 1377 (quoting *Zenith Radio Corp.*, 395 U.S. at 123.)

Here, as in *Mead*, we ask not whether the Group Homes have proven that *all* of their business losses were attributable to the Ordinance's enactment and enforcement, but rather, we examine whether they created a triable issue of fact that the City's actions "materially contributed" to these losses. Although the City and the district court are correct that the Group Homes did not submit declarations from particular residents stating that they left because of the City's actions, there was no requirement that they do so.  Drawing all inferences in the Group Homes' favor as we are required to do, we conclude that they submitted ample evidence that the City contributed to their losses.

Just like the employer in *Mead*, the Group Homes submitted evidence that their business declined and that the

resulting losses were both a predictable, and desired, result of the City's actions. The Group Homes' managers stated that they attract new residents primarily through referrals from care providers and their websites. There was evidence that both referral sources were affected by the Ordinance. The City's enforcement of the Ordinance was widely publicized in the care provider community and "[f]ew counselors and therapists wanted to refer their clients to [the Group Homes] because of the City's actions" as a result. NCR's manager described its referrals as "dr[ying] up completely" after the City's second denial of its permit application. The managers also explained that "our internet presence was drowned out by other web pages concerning the City's actions." In addition, current and prospective residents expressed concern to the managers about whether the Group Homes would close. A jury could infer from these facts that prospective residents were not referred to or deliberately stayed away from the Group Homes, and opted to reside elsewhere, as a result of the Ordinance's enactment and enforcement, without hearing any particular individual testify that he did so.

Indeed, prior to taking the opposite stance in litigation, city officials themselves credited the Ordinance with harming group homes. At a public meeting, Kiff stated that the Ordinance had been responsible for a reduction in bed counts of as much as 40% and described it as a key step to "bring[ing] owner-occupied back." In enacting the Ordinance, Council Member Henn promised City residents that it would "result in a substantial reduction in the number of group homes on the Peninsula" and asked to be "judge[d] . . . by our actual results."

Each of the Group Homes presented evidence that it experienced a precipitous decline in business after the

passage of the Ordinance.  Yellowstone's revenues declined over 50% between 2007 and 2009.  NCR's dropped over 40% between 2007 and 2008; it closed in 2009 due to insufficient business.[33]  Pacific Shores' business also declined nearly 50% in 2008.  Furthermore, it served fewer residents than it otherwise would have due to the 12-bed occupancy limitation it accepted in order to secure approval of its reasonable accommodation application.[34]

In sum, a jury could easily infer that the City's actions materially contributed to the Group Homes' losses.  The managers all stated that the Ordinance's enactment and enforcement led to reduced referrals, evidence showed that closing group homes was one of the Ordinance's primary goals, and the Group Homes' revenues plummeted in the immediate aftermath of the Ordinance's enactment.

This conclusion is not altered by the fact that some of the negative publicity about the Group Homes, which may have contributed to their business losses, was generated by the CCNB and other third-party sources.  At least some of the negative publicity that allegedly harmed the Group Homes'

---

[33] The City also argues that because NCR's permit application was not finally denied until January 2009, it could not have suffered any losses prior to that time. This argument is simply wrong.  A jury could certainly conclude that the threat of eventual closure contributed to NCR's decline in business even prior to the final denial of its permit application.

[34] There is no merit to the City's contention that these losses are not recoverable because Pacific Shores itself requested the 12-bed limitation. This argument disregards the fact that Pacific Shores' request for a 12-bed limitation was a result of the Hearing Officer's two prior denials of its request for an 18-bed reasonable accommodation.  In any event, as we have already explained, no such limitation would have applied if the City had not adopted the Ordinance in the first place.

businesses was generated by the City itself, including on its own website and in a letter circulated to all residents of Newport Beach. In addition, the press coverage from third-party sources was a foreseeable result of the enactment and enforcement of the Ordinance, and therefore a jury could find that it was proximately caused by the City. *See* Restatement §§ 431, 440, 441, 442A; *see also Farr v. NC Mach. Co.*, 186 F.3d 1165, 1169–70 (9th Cir. 1999) (applying the Restatement); *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978). In other words, the Group Homes have produced sufficient evidence that "the [discriminatory] policy at issue and the particular injury alleged are not only closely related, they are cause and effect." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008) (internal quotation marks and citation omitted).

Given that a jury could conclude that the City materially contributed to the Group Homes' decline in business, the Group Homes were not obligated to prove their losses with precision. As the Supreme Court has explained:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see BCS Services*, 637 F.3d at 759. The City argues that this principle is confined to the anti-trust context, but this view is undermined by cases from this court and others. The D.C. Circuit has described *Story Parchment* as a "seminal" case that "states the American rule on damages," *Hill v. Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003), and it has been relied on to lower plaintiffs' burden of proof regarding the quantum of damages in FHA cases, *see Silver Sage*, 251 F.3d at 820 n.6; *Samaritan*, 114 F.3d at 1235, and in countless other statutory tort-like contexts. *See, e.g.*, *Hill*, 328 F.3d at 684 (Foreign Sovereign Immunities Act); *Fidelity Interior Const., Inc. v. S.E. Carpenters Reg'l Council of United Bhd. of Carpenters and Joiners*, 675 F.3d 1250, 1264–65 (11th Cir. 2012) (Labor Management Relations Act); *Comcast of Illinois X v. Multi-Vision Elec., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (Cable Communications Policy Act); *Yonkers Branch-N.A.A.C.P. v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir. 2001) (apportionment of liability in desegregation funding order); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988–89 (9th Cir. 1995) (trademark infringement); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100–01 (3d Cir. 1995) (employment discrimination under the Age Discrimination in Employment Act); *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986) (Fair Labor Standards Act). Because the Group Homes submitted ample evidence from which a jury could infer that they lost some business as a result of the Ordinance, a jury would be entitled to determine the precise quantum of damages by drawing "just and reasonable" inferences from the evidence, given that the City's enactment of the Ordinance was an act that "preclude[d] the ascertainment" of what portion of the Group

Homes' decline in business was attributable to other causes.[35] *Story Parchment*, 282 U.S. at 563; *see, e.g.*, *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1501 (9th Cir. 1986) (holding that a jury reasonably estimated a terminated employee's lost commissions by relying on the commissions he earned the previous year, even though that year had been abnormally profitable).

## C

For similar reasons, the Group Homes also created a triable issue of fact regarding causation as to the expenses they incurred contacting referral sources and advertising to combat the widespread impression that the City was forcing them to close. The Group Homes' managers each testified that they expended substantial amounts of time combating the perception that they were on the verge of closure. As we explained above, diverted staff time is a compensable harm under the FHA and ADA. As to causation, the managers themselves explained that their promotional efforts were not undertaken because of a general, unexplained, drop in business, but rather because their referral sources were concerned whether they could remain open and provide a healthy atmosphere as a result of the Ordinance. Similarly, Pacific Shores increased its advertising expenditures in 2008 for the purpose of "inform[ing] the public that its Newport Beach houses were open and provided a safe place for sober living." In addition, Pacific Shores and NCR each hired a web consultant to assist them with promoting their presence on the internet *because* publicity surrounding the City's

---

[35] The City, of course, would be free at trial to present proof to the jury that a significant portion of the Group Homes' losses were attributable to other causes such as the downturn in the economy.

enforcement efforts appeared prominently in response to internet searches. The Group Homes' managers' testimony, which a reasonable jury could certainly credit, creates a triable issue of fact as to whether these expenses were incurred as a result of the Ordinance and the district court clearly erred in concluding otherwise.

## D

Finally, the individual Plaintiffs also challenge the district court's dismissal of their damages claims for emotional distress. Damages are available under the FHA for any unusual level of anxiety, embarrassment, or humiliation suffered by plaintiffs as a result of a defendant's discriminatory actions, and a plaintiff's testimony is sufficient to create a triable issue of fact as to such emotional distress. *See* 24 C.F.R. § 180.670(b)(3)(i) (HUD regulations recognizing availability of damages for "humiliation and embarrassment"); *see also Krueger v. Cuomo*, 115 F.3d 487, 492 (7th Cir. 1997) (tenant's testimony sufficient to establish FHA liability for emotional distress where her landlord's discriminatory actions made her "feel 'real dirty,' 'like a bad person,' and 'scared' her"); *Banai v. Sec'y of HUD*, 102 F.3d 1203, 1207 (11th Cir. 1997) (damages "clearly" available under FHA for "anger, embarrassment, and emotional distress" suffered by spurned tenant); *Morgan v. Sec'y of HUD*, 985 F.2d 1451, 1459 (10th Cir. 1993) (damages available under FHA for any emotional distress "which exceeds the normal transient and trivial aggravation attendant to securing suitable housing"); *cf. Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552–53 (9th Cir. 1980) (damages available to § 1982 plaintiff for "humiliation and distress" resulting from landlord's discriminatory refusal to rent commercial space).

Wiseman, a resident at Pacific Shores, testified at his deposition that he experienced anxiety as a result of Pacific Shores' potential closure.  The anxiety was sufficiently acute that he visited a doctor and was prescribed medication to manage his symptoms.  This testimony created a triable issue of fact as to whether he suffered compensable emotional distress.  The City argues that Wiseman waived his damages claim based on statements made at his deposition that he did not believe the City owed him damages.  In context, those statements constitute an expression of Wiseman's resentment towards the City rather than a "voluntary, deliberate, and informed" declaration of waiver.  *See Stroman v. West Coast Grocery Co.*, 884 F.2d 458, 462 (9th Cir. 1989) (recognizing that waivers of civil rights claims must be "voluntary, deliberate, and informed" (citation omitted)).

We agree with the district court, however, that Bridgeman did not create a triable issue of fact as to whether she suffered compensable emotional distress.  Bridgeman—a resident at Pacific Shores—stated only that she was "kind of upset" about the possible closure of Pacific Shores.  However, she also stated that she did not feel any stress as a result. Although an FHA plaintiff can certainly recover for distress, even if that distress does not physically manifest itself or necessitate pscyhological counseling, Bridgeman's mild annoyance at the Ordinance is insufficient to support a claim for emotional distress damages.

## CONCLUSION

For the foregoing reasons we reverse the district court's dismissal of the Plaintiffs' disparate treatment claims.  The Plaintiffs have created a triable issue of fact that the Ordinance was enacted in order to discriminate against them

on the basis of disability, and that its enactment and enforcement harmed them. We also reverse the district court's dismissal of all of the Plaintiffs' damages claims, except for its dismissal of Terri Bridgeman's claim for emotional distress.

**REVERSED AND REMANDED**.